489 S.E.2d 775

**Raymond J. BAUGH, Petitioner Below, Appellee,**

v.

**Starr Kay MERRITT, Respondent Below, Appellant.**

No. 23783.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 29, 1997.

Decided July 3, 1997.

W.T. Weber, Jr., Shannon R. Thomas, Weber & Weber, Weston, for Appellant.

R. Russell Stobbs, Weston, for Appellee.

## PER CURIAM

■ This is an appeal by Starr Kay Merritt from an order of the Circuit Court of Lewis County which transferred custody of her infant child, D.M., to the appellee, Raymond J. Baugh, who is believed to be the child's uncle. On appeal, the appellant claims that the procedure used by the circuit court in transferring custody was improper and that there was no appropriate factual basis to justify the transfer. After reviewing the issues presented, this Court concludes that the circuit court did employ improper procedures in trying the case, and for that reason this Court reverses the decision of the circuit court and remands this case for further development.

The record in this case indicates that the child involved in this case was born on August 19, 1992, and that he resided with the appellant, his natural mother, until December 1994, when because of financial difficulties, she determined that it was impossible for her to care properly for him. As a consequence, in 1994, she decided to seek work and a better life in the State of Missouri. Because of the situation she also decided to leave D.M. in the temporary care and custody of his paternal uncle, Raymond J. Baugh, until such time as she found work and established herself in the State of Missouri. Raymond J. Baugh, the appellee, apparently found this arrangement satisfactory.

Before the appellant left for Missouri she delivered D.M. to Raymond J. Baugh, and she also gave Raymond J. Baugh a handwritten note dated November 22, 1994, in which she authorized him to seek medical care for her son. Apparently, both the appellant and Raymond J. Baugh believed that this would be sufficient for Raymond J. Baugh to obtain financial assistance or a "medical card" to pay for the child's medical care.

According to the appellant, the note given to Raymond J. Baugh was not adequate to cover its intended purpose, and as a consequence, she executed another document on January 25, 1995, after she arrived in Missouri. That document which was on a pre-prepared form called a "Special Power of Attorney and Voluntary Appointment of Guardian" granted Raymond J. Baugh guardianship of the infant, D.M. The document contained a preprinted clause which stated:

This Power of Attorney shall become effective when I sign and execute it below. Further, unless sooner revoked or terminated by me, this Power of Attorney shall become NULL and VOID on ...........

The words "unknown at present time" were handwritten in the preprinted blank.

According to the appellant she was later informed that even this document was not sufficient to enable Raymond J. Baugh to obtain a "medical card" for D.M., and as a consequence she executed a form which she believed would qualify her son for a "medical card."

In May 1995, the appellant returned to Lewis County, West Virginia, and picked up her son and returned to Missouri. Shortly thereafter Raymond J. Baugh traveled to Missouri, according to the appellant, and threatened her with kidnaping and demanded her son. At this point the appellant returned her son to Raymond J. Baugh, and the child was returned to West Virginia. Thereafter, in September 1995, the appellant notified Raymond J. Baugh that she was returning to West Virginia to regain custody of her son and to terminate the temporary guardianship arrangement.

After receiving this notification Raymond J. Baugh instituted the present action in the Circuit Court of Lewis County. In instituting the action he sought to obtain the permanent custody and control of D.M. In his petition Raymond J. Baugh alleged that in December 1994, the appellant had turned custody of D.M. over to him and that from December 1994, she had neglected him. The petition also contained an allegation that she had abused him.

A hearing was conducted on November 3, 1995, and although according to the appellant the court did not have adequate time to hear all witnesses, she did introduce evidence re-

lating to her finances and the living arrangements which she had established for herself and her son in Missouri.

At a later hearing Raymond J. Baugh introduced evidence suggesting that the appellant had neglected her son prior to moving to Missouri.

The *circuit court, after hearing the evidence,* concluded that the appellant had intended to transfer permanent custody of D.M. to Raymond J. Baugh and that prior to living with Mr. Baugh the child was not well taken care of, was in dire need, and that his physical, mental and psychological well-being were not attended to. The court also found that the child had been abused and neglected, and that Raymond J. Baugh had become the psychological father of the child. The court concluded that the appellant had abandoned the child to Mr. Baugh and done nothing to support him or to assist in his support even thought she had been employed since 1994.

In the present proceeding the appellant claims that the trial court followed improper procedures in adjudicating this case. Among other things she claims that petition contained no allegation of abandonment. She further claims that there was no clear, cogent, and convincing evidence that she permanently transferred custody of D.M. to Raymond J. Baugh or that she had relinquished her parental rights to him. She also argues that there was no clear, cogent, and convincing evidence, that she had abused and neglected the child. Relating to this, she points out that she had not had actual physical custody of the child for approximately a year before the proceeding and that there could thus be absolutely no basis for the trial court to conclude that she was presently abusing or neglecting the child in such a way as to serve as a basis for terminating her custody under the abuse and neglect statute.

■ After the filing of the appeal in the present case, this Court on December 6, 1996, rendered an opinion in the case of *Overfield v. Collins,* 199 W.Va. 27, 483 S.E.2d 27 (1996). The *Overfield* case is closely analogous to the one presently under consideration, and in *Overfield* the Court detailed the procedures to be followed by a circuit court in adjudicating custody questions where a natural parent has relinquished custody to an individual other than a parent, and where there is some claim that the child's permanent custody should be transferred to the non-parent custodian. Several holdings in *Overfield* have bearing on the present case. First, in *Overfield* the Court stated that a document transferring custody of a child from a natural parent to a third-party, non-parent custodian should expressly provide whether the intention of the natural parent is to transfer the custody permanently or should indicate whether the intention is to transfer custody only temporarily. In syllabus point 6 of the *Overfield* case the Court stated:

> In the unlikelihood that the scrivener of a document voluntarily transferring the custody of a child between a parent and a third person fails to express any intention as to the duration of the custodial change, it shall be presumed that the transfer is temporary, and the burden of proof shall be upon the third person to prove by clear and convincing evidence, either intrinsic or extrinsic, that it was the intention of the parent to transfer permanent custody of the child to the third person.

In examining the documents in the present case, this Court cannot say that they expressly provide whether the transfer of custody of D.M. from the appellant to Raymond J. Baugh was intended to be a permanent or a temporary transfer of custody. Although the fact that the "Special Power of Attorney and Voluntary Appointment of Guardian" contained a clause indicating that it would become "NULL and VOID" would suggest that there was some intention to impose some limit upon the transfer of custody, that fact is not absolutely clear from the document.

In any event, given the nature of the documents involved, and given the holding in syllabus point 6 of the *Overfield* case, this Court believes that it was incumbent on Raymond J. Baugh to prove by clear and convincing evidence, either intrinsic or extrinsic, that the appellant intended to transfer from the custody of D.M. to him. Further, it does

not appear that Raymond J. Baugh met that burden of proof, although, in fairness to the circuit court, this Court must say at the time of hearing in the case, it had not clearly indicated that such burden was on a non-natural custodian in cases such as this one.

In syllabus point 2 of the *Overfield* case the Court further stated:

When a natural parent transfers temporary custody of their child to a third person and thereafter seeks to regain custody of that child, the burden of proof shall be upon that parent to prove by clear and convincing evidence that he or she is fit; thereafter the burden of proof shall shift to the third party to prove by clear and convincing evidence that the child's environment should not be disturbed because to do so would constitute a significant detriment to the child notwithstanding the natural parent's assertion of a legal right to the child. To the extend that our decision in *McCartney v. Coberly,* 250 S.E.2d 777 (W.Va.1978) is inconsistent with this holding, it is expressly overruled.

The Court also stated in syllabus point 3 of the *Overfield* case:

When a natural parent transfers permanent custody of his or her child to a third person and thereafter attempts to regain custody of that child, the burden of proof shall rest exclusively upon the parent attempting to regain custody of his or her child by proving with clear and convincing evidence: (1) that he or she is fit; and (2) that a transfer of custody so as to disturb the child's existing environment would constitute a significant benefit to the child. To the extent that our decision in *State ex rel. Harmon v. Utterback,* 144 W.Va. 419, 108 S.E.2d 521 (1959) is inconsistent with this holding, it is expressly overruled.

In reviewing the present case it is apparent to this Court that the trial court did not follow the procedures and analysis outlined in the *Overfield* case in reaching the decision to transfer custody of D.M. to Raymond J. Baugh, although as noted above the *Overfield* decision had not been released at the time of the trial court's action. For that reason this Court believes that the judgment of the circuit court should be reversed, and this case

should be remanded for treatment and consideration consistent with the standards set forth in the *Overfield* case.

In the present case the Court believes that given the fact that the custody documents do not expressly state whether the custody transfer was to be temporary or permanent, the trial court should presume that the transfer was temporary, and only if Raymond J. Baugh shows by clear and convincing evidence that the appellant's intention was to make a permanent transfer of custody should the documents be deemed to have transferred permanent custody. After determining whether the documents did transfer temporary or permanent custody, the Court should then proceed with a determination of the case consistent with the principles of the *Overfield* case and our other law relating to child custody.

The Court notes that in *Overfield* the Court did not depart from the principle set forth in *Lemley v. Barr,* 176 W.Va. 378, 343 S.E.2d 101 (1986), that the best interest of the child has always been regarded as superior to the right of parental custody and that where a child has been with someone other than a natural parent for an appreciable period of time, a potential material benefit to the child must be shown before a transfer of custody should be ordered.

Also, as previously indicated in *In the Matter of Lindsey C.,* 196 W.Va. 395, 473 S.E.2d 110 (1995), and *Overfield* in a case such as the present one the trial court should appoint a guardian *ad litem* to represent the interests of the infant child and should fashion a plan of visitation to afford the non-custodial parent with an opportunity to visit with the child pending the ultimate resolution of the case. The Court also believes, given the facts of this case, the trial court should consider whether, after the ultimate resolution of this case, the non-prevailing party should have the right of continued association with the child so as not to interrupt the continuity in bonding that may have been developed between the child and that party.

The judgment of the Circuit Court of Lewis County is, for the reasons stated, reversed, and this case is remanded for further devel-

opment consistent with the principles set forth herein.

Reversed and remanded with directions.

MAYNARD, Justice, dissenting:

I respectfully dissent because I strongly believe that being the parent of a two-year-old toddler is definitely not a part-time or temporary job, nor is it one that can be postponed, and I am convinced that the mother in this case simply does not appreciate or understand that basic fact, either intellectually or emotionally. Absent truly catastrophic circumstances, such as grave illness or extremely severe disability, no mother should ever abandon or even temporarily give up custody of a two-year-old child. One thing is absolutely certain, mere "financial difficulties," no matter how dire, are never circumstances which would justify a mother's abdication of her duty to nurture and care for her child, especially when the child is an infant or a child of very tender years.

Indeed, as I write this dissent there are literally thousands of women with children living in real and abject poverty who are nevertheless absolutely superb, wonderful and caring mothers. On top of that, many of them are single parents who get little or no help from absent fathers. These are mothers who positively would never consider leaving their child simply because times are hard or money is short. For them, leaving a child would simply be unthinkable, and they would be appalled if one were to suggest such a thing.

In their Opinion the majority states:

[t]he child involved in this case was born on August 19, 1992, and that he resided with the appellant, his natural mother, until December 1994, when because of financial difficulties, she determined that it was impossible for her to care properly for him . . . .

In fact, and in truth, it was not "impossible" for this mother to care for her little boy; it was merely inconvenient. Being the mother of a two year old is not something one does just when it is easy or convenient. Her cavalier and casual attitude toward her responsibility as a mother reminds me of a line from a popular song where a woman in a bar asks a man if he is married, and he replies, "Sometimes." Well, you can't be a mother just "sometimes" either. Unfortunately, this mother thinks she can.

The absence of a mother during the first three years of a child's life can have a dramatic, devastating and very negative effect on a child, and more particularly, on the entire rest of the child's life. As I write this, the President has just announced a recent White House Conference entitled "I Am Your Child," which is based upon studies and new evidence just released which emphasize how critical the first three years of a child's life are to all aspects of its future development. The Conference title and its theme is, "The First Three Years Last Forever." Simply and sadly, if a child doesn't get what it needs in the first three years, he or she never will thereafter.

Reporting on these developments, Barbara Vobejda wrote in the April 18, 1997 issue of *The Washington Post* the following:

A panel of experts at a White House conference yesterday described compelling new research showing that a child's language, thinking and emotional health are largely formed before age 3 and argued that the nation needs to intervene earlier if the lives of many disadvantaged young children are to be turned around.

In an unusual conference convening scientists and child development specialists from around the country, panelists called for high-quality day care, parenting education and expanded health coverage for children, much of which is supported by President Clinton and first lady Hillary Rodham Clinton.

\*    \*    \*    \*    \*    \*

The conference, carried by satellite to nearly 100 sites across the country, was meant to highlight a growing body of research that points to a period of rapid brain development in children from birth to age 3. Until a few years ago, infants were commonly viewed as passive creatures largely unaware and unaffected by their surroundings. But new research methods, including brain scans, have al-

lowed scientists to study the effect of a child's environment on brain development in the first years of life.

"The impact of the environment is dramatic and specific, not merely influencing the general direction of development, but actually affecting how the intricate circuitry of the brain is wired," according to "Rethinking the Brain," a report by the Families and Work Institute issued in connection with yesterday's conference.

Not only are most brain synapses—connections between brain cells—formed before age 3, the report said, "those synapses that have been activated many times by virtue of repeated early experience tend to become permanent; the synapses that are not used tend to become eliminated."

In effect, the research suggests that a child's brain structure is still forming after birth, and that the language they hear, the toys they play with, even the images they see combine to affect the brain's long-term development.

And the Associated Press reported:

A report by the New York-based Families and Work Institute, which was to form the core of the conference, found that during the first three years of life, the vast majority of the brain's synapses—or connections among brain cells—are formed.

The ways in which parents and other care givers relate with children during that formative period directly affect the child's emotional development and their ability to handle stress as adults, the report said.

In remarks during the conference, the First Lady said:

It is astonishing what we now know about the young brain and about how children develop. Just how far we have come is chronicled in a report being issued today by the Families and Work Institute, entitled "Rethinking the Brain." Fifteen years ago, we thought that a baby's brain structure was virtually complete at birth. Now, we understand that it is a work in progress, and that everything we do with a child has some kind of potential physical influence on that rapidly-forming brain.

\*     \*     \*     \*     \*     \*

And as we now know, for the first three years of their life, so much is happening in the baby's brain. They will learn to soothe themselves when they're upset, to empathize to get along. These experiences can determine whether children will grow up to be peaceful or violent citizens, focused or undisciplined workers, attentive or detached parents themselves.

\*     \*     \*     \*     \*     \*

That said, here is what I hope the conference will accomplish. I hope it will get across the revolutionary idea that the activities that are the easiest, cheapest and most fun to do with your child are also the best for his or her development—singing, playing games, reading, story-telling, just talking and listening.

In this case, the mother drastically failed her child because she was not there for singing, playing games, reading, story-telling, just talking and listening. You don't have to be rich to do any of these things with a child, but, at least, you do have to be there!

During this all-important three-year period, a child must have intense stimulation, contact, cuddling and affection; in other words, a high degree of attention must be focused directly on the child. He or she must be challenged and rewarded and taught a million things in direct and subtle ways, from motor skills to social interaction. Interestingly, this study finds that this maturation and development consists of both emotional and physical components. For example, a child who receives adequate attention and stimulation will physically develop approximately 100 billion nerve connections during this important three-year period; and, a child who does not receive adequate stimulation and nurturing will develop 25 to 30 percent less organic physical nerve connections. This deficit can never be reversed!

Of course, none of us really need to see the results of any university study to know that a two-year old child desperately needs intense emotional attention and stimulation to develop and mature properly. Our mothers and grandmothers knew it and so do we.

Kids of any age, but especially this age, need affection and love and they need it demonstrated constantly. They need to be hugged and cuddled. They need somebody to pick them up when they fall, and pet the hurt places, and kiss away the tears, and make them well, and put Band–Aids on even when they are not really needed. They need both parents and they especially need their mother. This little two-year-old boy urgently needed his mother and she should have been there to show him affection; she should have been there to wash his face and to dress him; she should have been there to teach him all the very important little things. This little boy needed his mother for all these and for a thousand other things every day. But she just was not there when he needed her so desperately. She abandoned him to others at this most critical part of his life.

This mother says she left her child when he was barely two years old because of financial difficulties. The majority accepts this excuse, but I simply cannot. Today, we live in the modern welfare state in the United States. In West Virginia we currently spend a very substantial part of our State budget each year to provide aid to mothers, such as Ms. Merritt, who have dependent children. If Ms. Merritt had bothered to go to the local DHHR office in Lewis County and ask for help, she would have received it immediately.

If she had gone to DHHR, what kind of help could she really have gotten and when? Would it have been substantial and meaningful help and would it really allow her the basic means to live and support her child?

Well, for starters, *the very day* she walked in the local DHHR office she would have received Gibson[1] funds to rent an apartment or house, or the DHHR would have put her up in a hotel or motel, fully at State expense, until they could find permanent housing for her. Also, that very same day, she would have received emergency food stamps to buy food and necessities for herself and her little boy, as well as emergency benefits. If she needed clothing for herself or her child, it likewise would have been provided that very

day. The same is true of medical care. If she or the child needed to see a physician or needed prescription medicine, she would have been given an emergency medical card that very day which would have paid the total cost of doctor visits, hospital bills and drugs. (Wouldn't you like to have a medical plan like that?!!) Gibson funds could have been used to do *anything* that would keep her and the child together. For example, Gibson funds can pay utility deposits, pay for transportation, hire a car, or pay gas money, buy a refrigerator or other appliances, or any one of a hundred other things.

The assistance described above was all available to Ms. Merritt on the same day she would have first visited the DHHR office. Long term, it is apparent she also would have received a monthly welfare check, monthly food stamps, free and complete medical, hospital and dental care, free rent through one of several HUD programs, and periodic vouchers for clothing for her little boy. In fact, with a child under five, she was eligible for the "WIC" program, which would provide vouchers for food for her and the baby *in addition* to food stamps; the program would provide regular infant medical screening and medical care *in addition* to her medical card. It was all free and it was all there for the asking. Given these facts, it is simply preposterous for this mother to claim that she had to abandon her two-year-old child who needed her so desperately because of financial reasons.

Having said all that, however, the facts of this case are not what I'm really fussing about. My real complaint is the law which the majority cites in deciding this case. They rely heavily on *Overfield v. Collins,* 199 W.Va. 27, 483 S.E.2d 27 (1996). I was not here when *Overfield* was decided in December 1996, and accordingly, had no opportunity to dissent in that case. I certainly would have, however, and since I couldn't then, I will dissent now, in the instant case.

Some of *Overfield* is bad law. It creates two different standards for determining custody of a child, depending on whether a

---

**1.** The so called *"Gibson"* case is *Gibson v. Ginsberg,* No. 78–2375 (S.D.W.Va. Sept. 28, 1981), which resulted in a Consent Decree which was entered on September 28, 1981, in the United States District Court for the Southern District of West Virginia.

parent who transferred custody did so on a temporary or a permanent basis.

Syllabus point 2 of this case, citing *Overfield*, establishes a fair and common sense procedure by which we can undo permanent custody transfers. The burden of proof is placed on the parent attempting to regain custody, and that parent has to prove: 1) that he or she is fit; and 2) that a transfer of custody which would disturb the child's existing environment would constitute a significant benefit to the child. This is a good rule which really serves the best interests of children who have been bounced around from pillar to post.

Oddly, that is not the rule by which we undo *temporary* custody transfers. I strongly believe the rule should be the same to reverse either temporary or permanent custody transfers. The *Overfield* rule for temporary transfers, which shifts the burden of proof to the third party after a showing of fitness, is not in the best interest of children in these types of custodial situations.

Further, the *Overfield* presumption that any transfer of custody, not expressly specific as to duration, is temporary is likewise not in the best interest of affected children. Children need continuity of caretakers and regularity in all aspects of life. That which is unknown and uncertain is what really generates anxiety and fear for all of us, adults and children alike.

Ideally, we would have only one test for reversing either temporary or permanent custody transfers, and that would be the *Overfield* test cited in syllabus point 1 of this case; and we would have no presumptions in favor of parents who give up children. I personally like the ancient cases which state that the Polar Star of Consideration in every child custody case should be what is best for the child. No presumptions and no "contract" analysis of the "intent" of parties concerning some writing should govern who gets custody of a child. Any rule of law that makes a child custody decision turn on a consideration of contract principles or legal presumptions is a bad rule. That is precisely what *Overfield* does and that is what is wrong with the case. Custody cases should be decided based on what is *best* for the child. Always!

In the majority opinion, they at least pay lip service to the "best interest" principle by referring to *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986), but they do not apply it in the present case in a practical way.

For the foregoing reasons, I think the trial judge in this case was right. Accordingly, I would affirm his wise decision to leave this little boy with people who really want him, and who will always be there for him when he needs them, and not just "sometimes" or when it is convenient.

There's a quote from the Chilean poet, Gabriella Mistral, that reminds us, "Many things we need can wait; the child cannot. Now is the time his bones are being formed, his blood being made, his mind being developed. To him, we cannot say, tomorrow. His name is today."

For those reasons, I respectfully dissent.