500 S.E.2d 877

STATE of West Virginia, Petitioner
Below, Appellant,

v.

JULIE G., Natural Mother of Emily G., an
Infant; and John F., Natural Father of
Emily G., an Infant, Respondents Below,
Appellees,

Emily G., an Infant, Appellant.

No. 24580.

Supreme Court of Appeals of
West Virginia.

Submitted Dec. 2, 1997.

Decided Dec. 17, 1997.

Dissenting Opinion of Chief Justice
Workman Dec. 18, 1997.

Cathryn A. Nogay, Weirton, Guardian ad Litem, for Appellant.

Thomas D. Hagg, Assistant Prosecuting Attorney for Hancock County, Weirton, for Appellant State of West Virginia.

F. William Brogan, Jr., Public Defender Corp., First Circuit, Weirton, for Appellee Julie G.

DAVIS, Justice:

In this child abuse and neglect action, Emily G.,[1] an infant, through her Guardian *ad Litem*, appeals an order of the Circuit Court of Hancock County finding that she was not a neglected child as defined in West Virginia Code § 49–1–3(g)(1)(A). We find that the circuit court failed to consider relevant evidence developed during Emily's mother's improvement period. Thus, its conclusion that Emily G. was not a neglected child was clearly erroneous.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In March of 1995, the West Virginia Department of Health and Human Resources [hereinafter "DHHR"] received a call from an individual expressing concern that Julie G. was neglecting her then fourteen-month-old daughter Emily G. The caller informed DHHR that Julie's parental rights to her two other children had been terminated by the State of Ohio, and that John F., Emily's father, had a serious criminal record and presented a potential risk of harm to the child.

Subsequent to this call, two DHHR protective service workers visited Julie at her mobile home on the afternoon of March 22, 1995. They found the home to be in a deplorable condition. It was dirty, had a foul odor and was cluttered. The only source of heat was a kerosene heater that was sitting precariously on top of a dresser in the bedroom. The kerosene heater was surrounded by papers, clothing and other flammable materials. The home had no running water, and the cooking stove did not work. The protective service workers expressed to Julie their concerns about the condition of the home. Julie explained that she was in the process of moving from a nearby mobile home, and that she expected her new landlord to quickly correct the problems with her new home. The workers learned that Julie's rent for her former residence was paid until the end of the month. They encouraged Julie to return to her former home until the problems with her new home were corrected. She declined.

The workers discussed Julie's financial resources with her, and Julie explained that she received Supplemental Security Income [hereinafter "SSI"], food stamps, a medical card, and a welfare check from the State of Ohio, where she had lived prior to moving to West Virginia earlier that month. Julie explained that she was also anticipating aid from a community utility resource agency. In addition, Julie stated that she had applied for West Virginia welfare benefits, but her application had been denied because she was still receiving benefits from Ohio. The workers instructed Julie on how to terminate her Ohio benefits so that she could receive West Virginia benefits.

Also during their visit, the protective service workers observed Julie's interactions with Emily. They perceived that Julie roughly handled Emily and seldom spoke to her. The workers further observed that Emily was drinking from a bottle, but appeared hungry. Julie was feeding Emily bites of scrambled eggs and toast from a plate she had prepared for herself. The workers asked Julie if Emily had eaten anything else that day to which Julie responded that she could not remember. Upon inspection, the workers noticed that there was little food in the home. Julie explained that her food supply had not yet been moved from her former home. The workers also found that

---

1. We follow our past practice in domestic and juvenile cases involving sensitive facts and do not use the last names of the parties. *See, e.g., State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, 470 S.E.2d 205 (1996).

Emily had dried feces on her bottom, and explained to Julie the importance of keeping Emily clean.

Finally, the workers questioned Julie about John F., who was not present during the visit. They expressed their concern regarding his criminal history. Julie stated that she knew that John F. had gone to prison for killing his wife, and that he had killed his prison cell-mate. She also stated that she had heard rumors that John had a history of child molesting, but she did not know if the rumors were true.[2] Julie explained that John rarely visited her and that he was never left alone with Emily. At the conclusion of their visit, the workers provided Julie with their phone number, offered their assistance and departed.

The following day, March 23, 1995, the workers received a call from Julie informing them that water service had been turned on at her new residence; however, she still did not have running water due to a plumbing problem. The workers encouraged Julie to notify her landlord. In addition, they once again urged her to return to her former home pending resolution of the problems in her new home. Julie again declined.

On March 24, 1995, the protective service workers visited Julie a second time. They found that there had been no improvement in the conditions of the mobile home. During this visit, they asked Julie how she was able to bathe Emily without running water. Julie responded that she left Emily unattended while she went to her former home to retrieve water. The workers also observed Julie changing Emily's diaper. Upon noting redness and apparent tenderness, they explained the proper method of changing a diaper and again stressed the importance of keeping Emily clean.

The protective service workers then asked to examine the mobile home from which Julie was moving so they could determine its suitability as a home. The workers found that the former home had heat, running water and a working cook stove, and appeared to be in better condition than her present home. They again encouraged Julie to return to her former home until the problems with her new residence were resolved. Julie once again declined. Also during this visit, Julie admitted that she was living with John F., and that she had moved to her current residence because it was larger. After returning to Julie's present home, the workers asked her to remain there until she heard from them.

The protective service workers then initiated the filing of an abuse and neglect petition through the Office of the Prosecuting Attorney for Hancock County. The petition was filed that day, March 24, 1995. The petition alleged that Julie's parental rights to her two other children had been terminated for neglect and abuse; that Emily was residing with Julie G. and John F. in a trailer without water, heat or a working cook stove; that Julie G. left Emily unattended in a mobile home containing a running kerosene heater; that Julie G. had demonstrated a lack of parenting skills; and that Julie G. and John F. had a history of lacking parenting skills.[3] That same day, the Honorable Judge Fred Riscovich issued an order authorizing DHHR to take emergency custody of Emily G. The workers returned to Julie's residence, also on March 24, and found that Emily had been taken to the home of her paternal grandmother in Ohio. The workers explained to Julie that criminal action could be taken if Emily was not immediately returned to West Virginia. Emily was returned, and DHHR took custody of her. Jul-

2. A court summary prepared by DHHR protective service workers, dated June 16, 1995, reported that John F. was "registered in the state [sic] of Ohio as a convicted child sexual abuser." The record further indicates that John F. had twice been charged with child molestation in the State of Arizona. On one occasion he apparently plead guilty to a lesser charge. On another occasion the charge was dismissed, possibly as part of a plea agreement. The record further indicates that John F. has a lengthy criminal history, including charges of public indecency, felonious assault, escape and aggravated assault.

3. An amended petition was filed on May 15, 1998, which included allegations against John F. that were not included in the original petition. While the amended petition re-stated the allegations previously asserted against Julie G., it did not supplement or modify those allegations. John F.'s parental rights were subsequently terminated by the circuit court's order of April 10, 1996.

ie waived a preliminary hearing regarding the court's award of emergency custody of Emily to DHHR.

Subsequent proceedings in this case were presided over by the Honorable Judge Ronald E. Wilson. At a hearing on May 8, 1995, Julie requested a pre-adjudication improvement period. During the same hearing, a case plan was tendered to the court by the DHHR protective service workers. The court then granted Julie a 60–day pre-adjudication improvement period. Thereafter, the court periodically extended Julie's improvement period and, on one occasion, modified her case plan. During this time, the court frequently held hearings to review Julie's progress. Each hearing was followed by an order. In these orders, the court occasionally noted that Julie was making progress with respect to her improvement period. Many of the orders addressed Julie's problems. The court noted on one occasion that Julie had missed two appointments for nutrition counseling by WIC,[4] and a later order noted that the counseling had been terminated.[5] Another court order required Julie to refrain from having animals in her home, and to keep a gate closed to prevent Emily from having access to a stairway. Several orders addressed Julie's continued contact with John F. The record reveals that Julie continued to receive visits from John even after the court entered orders prohibiting such visits. Julie's conduct was also contrary to an amended case plan[6] that had been approved by the circuit court on August 17, 1995, and which remained in effect until Jul-

ie's pre-adjudication improvement period was finally terminated.[7]

During Julie's improvement period, she was given a psychological evaluation by Dr. William Hewitt, a clinical and forensic psychologist. Dr. Hewitt determined that Julie functioned at the bottom of the low-average range of intelligence. He diagnosed Julie as suffering from Mild Depression, Mild Anxiety, Severe Personality Disorder with Avoidant, Dependent, Narcissistic, Negativistic, and Paranoid Features. Dr. Hewitt opined that Julie

> may be able to manage an infant and a child or children if she is in the company of a reasonably responsible companion, male or female, or with live-in supervision and help. But otherwise she probably won't be able to safely care for, manage, nurture, or adequately parent an infant or child.

> And as long as Mr. [F.] is in the picture she is unlikely to link up with either a responsible male or female companion.

Dr. Hewitt noted that Julie expressed a desire to live with John F. and have additional children with him. Dr. Hewitt's report concluded "[i]f [Julie G.] does not respond adequately to the requirements of her improvement period then consider termination of parental rights and adoption of her daughter."

A report filed on September 16, 1996, by the West Virginia Youth Advocate Program related that "[Julie G.] failed the *Parent/Child Relationship Inventory*, scored in the severe range of Depression, is inconsis-

---

**4.** WIC is a special supplementary food and health program for women, infants and children. *See generally* W.Va.Code § 16–2G–1 (1991) (Repl. Vol.1995); *Baugh v. Merritt*, 200 W.Va. 393, 400, 489 S.E.2d 775, 782 (1997) (per curiam) (Maynard, J., dissenting).

**5.** A letter from the WIC nutritionist working with Julie indicated that Julie was not cooperating and continuation of the program was not recommended.

**6.** The first case plan that was accepted by the circuit court was dated May 5, 1995, and included goals for John F. (*i.e.*, to get a psychiatric evaluation, to attend parenting classes and to maintain a regular schedule of supervised visitation with Emily). However, it quickly became apparent that John F. had no intention of participating in court proceedings regarding Emily G. or of cooperating with the case plan. Conse-

quently, the case plan was modified on July 21, 1995. The modified case plan, which was approved by the circuit court, suggested that Julie needed to "end all physical and emotion contact from John [F.] as recommended by Dr. C. William Hewitt."

**7.** While we ultimately reverse this case based upon our finding that the circuit court misapplied the relevant statute, we must commend the circuit court's efforts in its handling of this case. The court regularly and frequently reviewed Julie's progress and amended her case plan, without delay, when various needs became apparent. The court truly handled this case with the type of priority that child abuse and neglect cases deserve, but of which they are all too often deprived.

tent in keeping her home environment clean and hygienic, and poorly manages her finances." The report also detailed that, while Julie expressed love for Emily, Julie "demonstrate[d] significant impairment in providing a nurturing, safe life/environment for Emily. We have witnessed borderline abusive behaviors (physical and emotional) at times by [Julie G.]" Finally, the report expressed the organization's concern regarding Julie's involvement with John F. and another man who was suspected of being a child molester.

Several court summaries filed by DHHR protective service workers also reported Julie's lack of progress during her pre-adjudication improvement period. There were multiple reports of contact between Julie and John F. In addition, Julie repeatedly expressed a desire to continue a relationship with John F. and to have additional children with him. There were also reports of Julie's irresponsible spending, failure to take medicine prescribed to treat her depression, inability to maintain a neat and clean home, inability to maintain personal hygiene and failure to keep Emily on a regular eating and sleeping schedule.

In April, 1996, Emily's guardian *ad litem* moved for termination of the pre-adjudication improvement period. The circuit court, by order entered on May 21, 1996, and without explanation, denied the motion and continued Julie's improvement period. In September, 1996, Emily's guardian *ad litem* filed a second motion to terminate Julie's improvement period. This motion was granted at a hearing held on October 17, 1996. A corresponding order was entered on November 7, 1996, wherein the circuit court announced its finding that "no substantial improvement in [Julie's] circumstances has occurred under the pre-adjudicatory improvement period [sic] and the Court was of the opinion that she will not substantially improve within a short period of time."

Following its termination of Julie's pre-adjudication improvement period, the court held an adjudicatory hearing on January 17, 1997. After hearing testimony presented by the two protective service workers who initially visited Julie G., and Julie's own testimony, the circuit court determined that Emily was not a neglected child as defined by W.Va.Code § 49–1–3(g)(1)(A). It is from this order, which is more thoroughly discussed below, that Emily G. now appeals.

## II.

## DISCUSSION

### A.

### *Standard of Review*

In this appeal, we are asked to reverse an order of the circuit court finding that Emily G. was not a neglected child. Generally, we give plenary review to a circuit court's resolution of questions of law, while factual determinations made by the circuit court are reversible only when they are clearly erroneous. Justice Cleckley recently explained the appropriate standards in Syllabus point 1 of *In the Interest of: Tiffany Marie S.*, wherein this court held:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

196 W.Va. 223, 470 S.E.2d 177 (1996). Justice Cleckley further explained that:

> [w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [of the West Virginia Rules of Civil Procedure] demands even greater deference to the trial court's findings[.] . . . Deference is appropriate because the trial judge was on the spot and is better able than an appellate court to decide whether the error affected substantial rights of the parties.

*Tiffany Marie S.*, 196 W.Va. at 231, 470 S.E.2d at 185 (internal quotations and citations omitted). We have thoroughly reviewed the record submitted in this case with due consideration for the standards set forth above and, as hereinafter explained, we are left with the definite and firm conviction that a mistake has been committed.

### B.

### Adjudication of Neglect

Emily G., through her Guardian *ad Litem*, argues that the circuit court erred in concluding that she was not a neglected child as defined by W.Va.Code § 49–1–3(g)(1)(A) (1994) (Repl.Vol.1996).[8] We agree.

On January 17, 1997, the circuit court conducted a hearing to determine whether Emily G. was an abused or neglected child. Testimony was received from the two DHHR protective service workers who visited the mobile home where Julie and Emily were residing at the time the abuse and neglect petition [hereinafter sometimes referred to as "petition"] was filed. Testimony was also received from Julie G. Following the hearing, the court entered an order, dated May 13, 1997, concluding that Emily G. was not an abused or neglected child.

Comments included in the May 13, 1997, order indicate that the circuit court accepted Julie G.'s testimony explaining the conditions that existed at her home at the time the petition was filed, as well as her assertions that such conditions were quickly corrected. The court relied upon Julie's testimony in spite of the fact that evidence which came to light during her lengthy improvement period indicated otherwise. For example, Julie testified that she had corrected the heat, water and stove problems by Sunday, March 26,

1995, which date was two days following Emily's removal from her home. In addition, Julie asserted that her mobile home was dirty and disorderly due only to her recent move.

■ Conversely, a case plan dated May 5, 1995, more than one month after Emily's removal, included, as one of the goals to be met, "[i]mprove living conditions, i.e., sufficient heat and water service. Also, maintain a clean and safe living environment." The inclusion of this goal indicates that the heat and water problems had not yet been resolved. Furthermore, it appears that once the problems were resolved, Julie continued to have trouble maintaining an appropriate home environment. A status review report dated June 16, 1995, related that "[a]t this time, Julie has no heating or cooking fuel in her trailer. This prohibits her from preparing meals and bathing. She has stated that she cannot remedy this before she receives her SSI check on 7–1–95. She has exhausted community resources for assistance." At the conclusion of this evidence, the circuit court found that Julie's living conditions were "in a significant way caused by a lack of financial resources." The court opined that "SSI, food stamps, a medical card and the possibility of welfare benefits may have seemed adequate to [Julie], but those resources would provide a budget balancing challenge to the best financial planner." Notwithstanding the fact that Julie may not have had an excess of funds, the record evidence demonstrates that during her improvement period she failed to utilize the limited funds available to her to provide necessities for herself and Emily (who was present only during scheduled visits) and, instead, spent her money on expensive luxuries.[9] Moreover, the record reveals that Julie was unable to consistently main-

---

8. Pursuant to W.Va.Code § 49–1–3(g)(1)(A) (1994) (Repl.Vol.1996), a neglected child is a child

> [w]hose physical or mental health is harmed *or threatened* by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian[.]

(Emphasis added).

9. Julie purchased a tread mill costing more than $600.00, entered into an agreement to purchase $145.00 worth of portraits of Emily, contracted to rent a color TV for $54.00 per month and bought, and then returned, a $1,500.00 reclining chair equipped with a massager and a telephone. During these periods of extravagant spending, Julie's telephone service was disconnected for failure to pay overdue charges when, according to one report, Julie needed to maintain phone service due to seizures Emily was having, and Julie received a shut-off notice from the power company for lack of payment. She entered into an installment agreement to remedy her past due

tain a clean and safe home environment during her improvement period.

The court further recognized, in its order of May 15, that Julie's parenting skills proved to be inadequate during the improvement period:

as we all learned from the prolonged (but justified) pre-adjudicatory improvement period granted in this case, the [DHHR Protective Service] Workers were correct in their initial questioning of [Julie G.'s] ability to make rational choices. *But this Court's findings must be based upon conditions existing at the time of the filing of the Petition.*

(Emphasis added). Having made this observation, the court nevertheless concluded that Emily was not a neglected child at the time the abuse and neglect petition was filed. We find the court's conclusion in this respect to be inconsistent with its observations.[10] Apparently, as indicated by the above quote, the court believed that information discovered during a pre-adjudication improvement period may not properly be considered in assessing the conditions that existed at the time of the filing of an abuse and neglect petition. We find that the circuit court misinterpreted the relevant statute.

W.Va.Code § 49–6–2(c) (1992) (Repl.Vol. 1995)[11] provides for a hearing before the circuit court to determine whether a particular child is abused or neglected. That section of the Code states:

(c) In any proceeding under this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses. The petition

shall not be taken as confessed. A transcript or recording shall be made of all proceedings unless waived by all parties to the proceeding. The rules of evidence shall apply. *Where relevant, the court shall consider the efforts of the state department to remedy the alleged circumstances. At the conclusion of the hearing the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected, which shall be incorporated into the order of the court. The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing proof.*

(Emphasis added).

While W.Va.Code § 49–6–2(c) requires that a circuit court's findings "must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing proof," the statute also provides that:

Where relevant, the court *shall* consider the efforts of the state department to remedy the alleged circumstances. At the conclusion of the hearing the court *shall* make a determination *based upon the evidence* and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. . . .

(Emphasis added). This language is mandatory. *See* Syllabus point 3, *Ruble v. Office of Secretary of State*, 192 W.Va. 134, 451 S.E.2d 435 (1994) (per curiam) (" ' "The word 'shall' in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Syl. pt. 2, *Terry v. Sencindiver*, 153 W.Va. 651, 171 S.E.2d 480 (1969).'

account with the power company, but had to be reminded to pay the installments. W.Va.Code § 49–1–3(g)(1)(A) excludes from the definition of a neglected child a child who is deprived of certain necessities due to a lack of financial means. However, the failure on the part of a parent to properly manage his or her finances does not constitute a lack of financial means.

**10.** We note a further inconsistency between the circuit court's finding that Emily G. was not a neglected child and its order of November 7, 1996, which terminated Julie G.'s pre-adjudication improvement period. In the order of November 7, the circuit court observed that "no

substantial improvement in the said respondent's [Julie G.'s] circumstances has occurred under the pre-adjudicatory improvement period [sic] and the court was of the opinion that she will not substantially improve within a short period of time."

**11.** While the 1992 version of W.Va.Code § 49–6–2(c) is applicable to the case at bar, we note that this provision was amended in 1996. However, the changes to subsection (c) were merely stylistic. Thus, our observations regarding subsection (c) also apply to the 1996 amended version of that subsection.

Syl. pt. 5, *Rogers v. Hechler*, 176 W.Va. 713, 348 S.E.2d 299 (1986).”). Thus, the legislature has clearly provided that a circuit court must consider facts developed during the improvement period where relevant.[12]

The case *sub judice* is a striking example of the inconsistent results which can be reached when relevant evidence has not been included in the circuit court’s determination of neglect. At the time the DHHR protective service workers first visited Julie G.’s residence, they found that necessities such as heat, food and water were not present. The home was observed to be unclean and in disarray during both of the visits that preceded the abuse and neglect petition. Julie appeared to be inattentive to Emily and demonstrated an inability to properly clean and feed her. In addition, Julie admitted to having left Emily unattended on one occasion when she went to her former mobile home to retrieve water. The workers were also concerned that the kerosene heater was a fire hazard due to the clutter in the home, and that it also presented a danger to Emily. Although Julie was encouraged by the workers to return to her former home, which had heat, running water and a working cook stove, she consistently refused. Finally, the workers expressed concern regarding contact between Emily and John F. Julie first asserted that John had very little contact with Emily and was never left alone with her, but later admitted that she and John F. resided together.[13]

Responding to these allegations, during her testimony at the January 17, 1997, hearing, Julie G. represented that her mobile home was equipped with heat, water and a working cooking stove within two days of Emily’s removal. She also explained that her home was cluttered because she was in the process of moving into the home. Julie further stated that Emily was well fed and that she took appropriate measures to see that Emily was prevented from coming into contact with the kerosene heater. In addition, she testified that she did not want to return to the first trailer because the pipes under the kitchen sink leaked and, contrary to what she had previously told the DHHR protective service workers,[14] because there was no heat in one room and the roof also leaked.[15]

Julie’s testimony was greatly contradicted by her performance during the pre-adjudication improvement period. During the improvement period she was unable to maintain her home as a clean and safe environment for a young child. She refused to cooperate with a nutrition program provided by WIC, to such a degree that the program was canceled. Also during part of her improvement period, Julie lived in an apartment with stairs. Although she had a gate to prevent Emily from falling down the stairs, she failed to keep it closed.[16] While Julie insisted that she had appropriate funds and assistance to provide for herself and Emily, she was unable to

12. We have frequently held:

> “ ‘ “Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.” Syl. pt. 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968).’ Syllabus point 1, *Courtney v. State Dept. of Health of West Virginia*, 182 W.Va. 465, 388 S.E.2d 491 (1989).” Syllabus point 3, *Francis O. Day Company, Inc. v. Director, Division of Environmental Protection*, 191 W.Va. 134, 443 S.E.2d 602 (1994).

Syl. pt. 5, *Walker v. West Virginia Ethics Comm’n*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

13. All of these concerns were addressed in the abuse and neglect petition filed in this case.

14. The protective service workers represented that when they encouraged Julie to return to the first mobile home, she refused to do so because the second mobile home had more room to ac-

commodate herself, John F. and Emily, and her clothes had already been moved into the second mobile home. Julie also informed the workers of the leaking pipes. They suggested that a bucket placed under the sink would catch any leaking water.

15. Interestingly, Julie chose not to return to a mobile home that had a working stove, heat, except for one room, and running, though leaking, water, in favor of a mobile home that had a portable source of heat, which, at best, warmed only one room, and that had no working stove and either no running water or only cold running water.

16. An order entered by the circuit court on March 12, 1996, warned that if Julie did not “keep the stairgate in position to prevent her child from climbing the steps during visitation with her said child, then such visitation shall terminate and end.”

manage those funds to provide necessities and, instead, spent her money on expensive luxuries. Moreover, despite repeated efforts by the protective service workers, and others providing services to Julie during her improvement period, to convince Julie to eliminate all contact with John F., she failed to do so. By permitting John to visit her home, frequently when Emily was present, Julie violated a court order, or contributed to the violation of a court order,[17] directing her and John to refrain from having contact with each other. Julie's consistent refusal to discontinue contact with John F. was also contrary to the amended case plan developed by the DHHR and approved by the circuit court. In addition, it appeared that Julie had no intention of complying with the court orders and her case plan, as she often expressed her desire to have a future with John and to have additional children with him.

The circuit court obviously believed that it must disregard facts that supported the initial concerns of the protective service workers, because such facts were not discovered until after the filing of the petition. In this regard, the court stated:

In March 1995, had the Workers visited Julie [G.'s] home *without* the information about John [F.'s] criminal history and *without* the information that Julie [G.] had been a neglectful mother, they would have found a mother and a child in a mobile home where the living conditions, while uncomfortable, *were not life threatening*

and were being addressed by the mother. In deciding whether an emergency Order removing the child was necessary, they would or should have considered that the mother moved to a new trailer primarily for safety reasons and that this was evidence of her concern for Emily. The Workers would have or should have tempered their concern that Emily was hungry, with the observation that she was well-nourished and appeared to be in good health. As experienced child protection Workers, they would have acknowledged that the newly occupied mobile home, while messy and not as clean as they liked, did not constitute child neglect. That Emily could have been cleaner, while desirable, would not justify a finding of child neglect or a finding that there existed imminent danger to the physical well-being of the child.

(Third emphasis added).[18]

Had the circuit court properly evaluated the conditions that existed at the time of the filing of the petition in light of Julie's performance during the pre-adjudication improvement period, as required by W.Va.Code § 49–6–2(c), we believe that it could have reached only one conclusion. That Emily was a neglected child within the meaning of W.Va.Code § 49–1–3(g)(1)(A).

▮ We note, however, that W.Va. Code § 49–6–2(c) (1992) (Repl.Vol.1995) directs, in mandatory language, that the court consider evidence related to DHHR's attempts to remedy conditions *alleged in the petition*, where relevant.[19] Thus, such evi-

---

17. An order resulting from a hearing held on December 12, 1995, and entered on April 4, 1996, directed that John F. "shall not contact Julie [G.], and, in the event he does, he shall be in contempt of this order of the court." At a subsequent hearing on March 15, 1996, the circuit court noted that Julie had admitted, in open court, to having contact with John F. Consequently, the court ordered that Julie have no contact with John F. either directly or indirectly.

18. In addition to our discussion below, we note at this juncture that the standard for neglect indicated by the court in the immediately preceding quote does not comport with the standard set forth in W.Va.Code § 49–1–3(g)(1)(A), which requires only that a child's "physical or mental health" be *"harmed or threatened"* (emphasis added). It is not necessary to find that the child

is presently harmed or that the conditions in which the child lives are "life threatening."

19. In determining what evidence is relevant, the circuit courts must look to Rule 401 of the West Virginia Rules of Evidence, which rules apply as explicitly stated in W.Va.Code § 49–6–2(c). Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." For the purposes of a hearing under W.Va.Code § 49–6–2(c), facts that are "of consequence to the determination of the action," as provided in Rule 401, are facts "based upon conditions existing at the time of the filing of the petition" as required by W.Va. Code § 49–6–2(c). *See* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,*

dence can only be considered to the extent that it relates back to the conditions that existed at the time of the filing of the petition and that were alleged in the petition. We therefore hold that, in making a determination of whether a child is an abused and/or neglected child as defined in W.Va.Code § 49–1–3 (1994) (Repl.Vol.1996), a court must consider evidence of a parent's progress, or lack thereof, during the pre-adjudication improvement period. However, pursuant to W.Va.Code § 49–6–2(c) (1996) (Repl.Vol. 1996), such evidence is proper only if it relates back to conditions that existed at the time of the filing of the abuse and/or neglect petition, and that were alleged in such petition. Evidence regarding a parent's pre-adjudication improvement period may not be used to informally amend a previously-filed petition. The proper method of presenting new allegations to the circuit court is by requesting permission to file an amended petition pursuant to Rule 19 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings.[20] We hold further that, under Rule 19 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, amendments to an abuse/neglect petition may be allowed at any time before the final adjudicatory hearing begins. When modification of an abuse/neglect petition is sought, the circuit court should grant such petition absent a showing that the adverse party will not be permitted sufficient time to respond to the amendment, consistent with the intent underlying Rule 19 to permit liberal amendment of abuse/neglect petitions.

The burden of proving that a child is abused or neglected is placed upon the DHHR. In this regard, we have held:

" ' "W.Va.Code, 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition … by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994). Syllabus Point 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995). We believe DHHR met its burden in this case. The court below misinterpreted the law with regard to the proper evidence to be considered in determining whether a child is abused or neglected. Therefore, the court's findings of fact in this case were improperly limited to a specific point in time at which the facts had not been adequately developed. We have thoroughly reviewed the record presented on appeal and have considered all of the relevant facts, and we are left with the definite and firm conviction that a mistake has been committed. Consequently, we find that the circuit court's conclusion that Emily G. is not a neglected child is clearly erroneous. We reverse the May 13, 1997, order of the Circuit Court of Hancock County.[21] We

§ 4–1(A), at 199 (3d ed. 1994) (explaining that "[u]nder Rule 401, for evidence to be relevant in the broad sense it must satisfy the two requirements of relevancy and materiality"); *id.*, § 4–1(B), at 200 (stating that materiality "is determined by considering what issues have been raised either *by the law governing the case* and/or the pleadings") (emphasis added); *id.*, § 4–1(C), at 201 (defining relevancy as involving circumstantial evidence, which is "evidence of some subordinate fact from which the existence of some ultimate fact in dispute is sought to be inferred").

20. Rule 19 of the W.Va.Rules of Procedure for Child Abuse and Neglect states:

The court may allow the petition to be amended *at any time until the final adjudicatory hearing begins*, provided that an adverse

party is granted sufficient time to respond to the amendment. After the final adjudicatory hearing begins, a petition may be amended if the amendment does not prejudice an adverse party. If the petition is amended after the conclusion of a preliminary hearing in which custody has been temporarily transferred to the Department or a responsible person, it shall be unnecessary to conduct another preliminary hearing.

21. Emily also complains that the circuit court erred in permitting Julie G.'s pre-adjudication improvement period to continue for more than a year when Julie G. exhibited no substantial improvement. Because we have granted the relief requested by Emily, and because W.Va.Code § 49–6–12 (1996) (Repl.Vol.1996), which became effective shortly before Julie's improvement peri-

further find that Emily G. is a neglected child as defined in W.Va.Code § 49-1-3(g)(1)(A), and that Julie G. is an abusing parent, as defined in W.Va.Code § 49-1-3(b) (1994) (Repl.Vol.1996).[22]

## III.

### CONCLUSION

For the foregoing reasons, we reverse the May 13, 1997, order of the Circuit Court of Hancock County, and remand this case for further proceedings.

Reversed and Remanded.

STARCHER, Justice, dissenting:

When circuit judges determine that a child is neglected, or that parental rights be terminated, the decisions of this court often (and in my view quite properly) state that in these difficult cases we must give deference to the circuit court's perception and weighing of the evidence. Why? Because the judges see the people involved. The judges get a sense and feel of the situation and can size it up. Is this parent well-meaning and trying? Could the parent, with enough support, do a decent job? Look at the child—is it really fair to say that the child is neglected? Is it really fair to say that the parent is an abuser? Is it fair to separate a child from a parent, even when limited parenting skills are obvious? It's a tough call to make such determinations, and I think that it's a call that requires a face-to-face look at the people involved, to be done well.

But when circuit judges say—based on the same sorts of assessments—that a child should *not* be found to be neglected, or that parental rights should *not* be terminated, that the court should give the parent-child relationship another chance—then I sense that our decisions too often tend to find reasons why we shouldn't defer to or trust the circuit judge's judgment.

*If* my perception is *correct*, it would mean that our decisions are applying a double standard to circuit judges' decisions in this area, and I hope we will move toward a more even-handed approach. *If* my perception is *wrong*, then I hope I will come to see my error, which I admit I don't at this time.

I do not quarrel with the principles that command us to look to the best interests of children, but this should not occur without some concern for parental rights—and recognition that children often love very much imperfect parents. To separate children from their moms and dads in such instances might well violate the very principles on which we say we are standing—the best interests of children.

We must trust circuit judges quite a bit in these cases, whichever way they go—not just when they decide in favor of neglect, abuse, and parental rights termination.

Accordingly, I respectfully dissent. I would uphold the judge's decision.

WORKMAN, Chief Justice, dissenting:
(Filed Dec. 18, 1997)

I take issue with the majority's conclusion that evidence relating to a pre-adjudicatory improvement period is only "proper" (whatever that means) [1] for a circuit court's consideration if it relates back to conditions that existed at the time of the filing of the petition and that were actually alleged in the petition. The majority takes a far too narrow and technocratical view of what evidence can properly be considered by the circuit court in an abuse and neglect proceeding. While the source of the majority's reasoning is clearly West Virginia Code § 49-6-2(c) (1995), that same statute also provides that the rules of evidence are applicable to abuse and neglect proceedings. Thus, any determination as to the admissibility of evidence in an abuse and

---

od was terminated, now limits a pre-adjudication improvement period to three months, we need not address this issue. *See also* W.Va.R.Proc. for Child Abuse & Neglect, Rule 23(b) (Preadjudicatory Improvement Period Status Conferences).

**22.** Pursuant to W.Va.Code § 49-1-3(b) (1994) (Repl.Vol.1996), " '[a]busing parent' means a parent, guardian or other custodian, regardless of his or her age, whose conduct, as alleged in

the petition charging child abuse or neglect, has been adjudged by the court to constitute child abuse or neglect."

**1.** The meaning of the term "proper" in this context is unclear, but I take it to mean admissible. Evidence is admissible when it is authentic, relevant and competent. *See* 1 Franklin D. Cleckley, Handbook of Evidence for West Virginia Lawyers § 1–5(B) at 22 (3rd ed. 1994).

neglect petition is governed by Rule 401 of the West Virginia Rules of Evidence.[2] Clearly, even the statutory language at issue which states that the circuit court's "findings must be based upon conditions existing at the time of the filing of the petition" does not preclude a circuit court's consideration of other relevant evidence concerning a parent's performance during a court-ordered improvement period, especially in light of the clear language and substantive tenor of abuse and neglect law the last ten years.

While I am not suggesting that evidence concerning matters not alleged in the original petition could alone support an adjudication of abuse and neglect absent an amendment, such evidence is clearly relevant insofar as it would "tend[ ] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.Va.R.Evid. 401. Moreover, as we recognized in *Teter v. Old Colony Co.*, 190 W.Va. 711, 441 S.E.2d 728 (1994), "it is clear that a legislative enactment which is substantially contrary to provisions in our Rules of Evidence would be invalid." *Id.* at 726, 441 S.E.2d at 743. Thus, if a conflict arises between a statute and a rule relating to evidence, then the rule of evidence prevails. *See id.* Furthermore, whenever a child appears in court, he is a ward of that court. W.Va.Code § 49–5–4 (1996); *Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992). Courts are thus statutorily reposed with a strong obligation to oversee and protect each child who comes before them. As Justices Cleckley and Albright stated in *West Virginia Department of Health and Human Resources ex. rel. Wright v. Brenda C.*, 197 W.Va. 468, 475 S.E.2d 560 (1996), "[a]bove all else, child abuse and neglect proceedings *relate to the rights of an infant.*" *Id.* at 477,

475 S.E.2d at 569. We have also recognized on more than one occasion that a circuit court should have before it *all* relevant evidence, which would clearly include evidence adduced after the petition's filing concerning any court-ordered improvement period. *See In re Carlita B.*, 185 W.Va. 613, 626, 408 S.E.2d 365, 378 (1991) (recognizing that court's determination at the conclusion of the improvement period in an abuse/neglect case involves a decision regarding "whether sufficient improvement has been made *in the context of all the circumstances of the case* to justify the return of the child") (emphasis supplied). Moreover, this approach is consistent with the whole tenor of the case law as enunciated by this Court over the last ten years. *See Carlita B.*, 185 W.Va. at 625, 408 S.E.2d at 377. Otherwise, we are asking judges to be like ostriches with their heads in the sand.[3]

The majority opinion faults the circuit court for its failure to consider all the relevant evidence, while at the same time holding that such evidence is not "proper" unless it relates back to the allegations set forth in the petition. Further, the majority (which should be functioning as an appellate body, not a fact-finder) actually makes its own determination of abuse and neglect sufficient to terminate the parental rights of Julie G[4] essentially on the basis of a cold and dirty trailer and on the mother's inability to manage her money well. Despite the fact that I have historically been rather rabid about the protection of abused and neglected children, I hope we have not reached the Orwellian day where parental rights are terminated for dirty housekeeping and lack of judgment with money. These problems can be corrected with educational intervention and home-

---

**2.** West Virginia Rule of Evidence 401 provides that " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**3.** This ostrich-like stance is reflected by the dramatic inconsistency in the circuit court's finding in its order of November 7, 1996, "that no substantial improvement in the said respondent's [Julie G.'s] circumstances has occurred under

the pre-adjudicatory improvement period" as the predicate to its termination of the improvement period, and the court's almost simultaneous finding during the January 17, 1997, adjudicatory proceeding that Emily G. was not an abused or neglected child.

**4.** The majority remands for further proceedings, but does not specify what sort of proceedings remain under this holding.

maker services. But evidence of a truly *significant* parental deficit arose when it became clear that Julie G. was unwilling or unable to comport with the clear objectives of her improvement period by affording her child protection from a man with a record of violence and child molestation.

The primary purpose of the statutory requirement of West Virginia Code § 49–6–2(c) that the court's "findings must be based upon conditions existing at the time of the filing of the petition" is to assure that one whose parental rights are on the line has adequate notice of the allegations and to provide him/her with an adequate opportunity to meet those charges. Once a parent, fully represented by legal counsel, is placed on an improvement period by court order, they are clearly on notice with respect to what is expected of them. Their level of compliance is clearly relevant, at a minimum to circumstantially show the degree of willingness to remedy the circumstances leading to the abuse and neglect changes.

Lastly, this case points out that it is absolutely incumbent upon petitioners and guardian ad litems in abuse and neglect proceedings to formally amend the petition when additional facts evidencing abuse or neglect which are substantial in nature arise subsequent to the filing of the initial petition. The instant case should have been remanded to the circuit court with directions that it consider evidence relating to the mother's compliance (or lack thereof) with the improvement period, and that the court make competent findings of fact and conclusions of law with regard thereto.

For the foregoing reasons, I respectfully dissent.