STATE *ex rel.* CLYDE E. LEMASTER, *et al.*

*v.*

HONORABLE HARVEY OAKLEY, *Judge, etc.*

*and*

EDWIN F. FLOWERS, *Commissioner, etc.*

(No. 13446)

Submitted January 15, 1974.      Decided March 12, 1974.

591

Daniel F. Hedges, James M. Cagle, *Appalachian Research and Defense Fund,* for relators.

*Chauncey H. Browning, Jr.,* Attorney General, *Cletus B. Hanley,* Deputy Attorney General, *Phillip D. Gaujot,* Assistant Attorney General, for respondents.

HADEN, JUSTICE:

Clyde E. and Patricia A. Lemaster, indigent parents of Billy Joe, their infant son of almost three years, invoke the original jurisdiction of this Court and seek a writ of habeas corpus against the Honorable Edwin F. Flowers, Commissioner of the Department of Welfare. The object of their petition is to regain the custody of the infant from the department, which has held temporary custody of Billy Joe since June 1971, pursuant to intermittent orders of the Juvenile Court of Logan County.

The relators also contend that, as indigents whose fundamental rights of parenthood are being abridged by State action, they are entitled to the assistance of court-appointed counsel to protect their interest in a pending neglect proceeding in the same juvenile court which could result in the termination of their parental rights to the custody, care and companionship of Billy Joe.

The department originally acquired custody of Billy Joe after Sharon L. Winkler, a social caseworker with the department, filed a petition in the juvenile court on May 21, 1971, alleging that the Lemaster child, born April 8, 1971, was a neglected child as defined in West Virginia Code, Chapter 49, Article 1, Section 3 (Michie 1931), as amended. After inspection of the petition, the juvenile court entered an order on June 2, 1971, finding Billy Joe Lemaster to be a neglected child, and temporarily awarding his custody to the Division of Child Services of the department. The order set a hearing on the petition on June 11, 1971.

The parents appeared on June 11th without counsel. The court heard no testimony and continued the hearing until July 2, 1971, at which date and by joint motion of the State and the parents, the hearing was rescheduled again for August 16, 1971.

At the August 16th hearing, the State presented certain evidence concerning the alleged neglect of the infant, the father's drinking habits, and the parents' inability to adequately care for the child. This evidence was introduced through the testimony of Ms. Winkler based upon her personal observations and her expertise as a professional social worker. The court also considered a written case summary filed by the caseworker concerning the Lemaster family. The relators were not represented by counsel at that hearing.

On September 28, 1971, the juvenile court entered an order by which the court determined again, based upon the evidence presented by the State and the written summary of the social worker, that the infant was a neglected child within the meaning of the laws of the State and that the temporary custody of the child should remain with the department.

As an addendum to that order, the court provided the Lemasters with the opportunity to petition the court for review within ninety days of the temporary award and

indicated that the court would reconsider its order: "If the natural parents . . . can show that they have established a proper home and suitable environment for the care of said child."

Pursuant to the juvenile court's suggestion, the petitioners say they obtained new and better housing in an effort to satisfy the demands of the welfare department. Although Lemaster informed the department of the purchase of the newer home, its representatives failed to visit and inspect the residence. The relators also contend they made repeated inquiries of both the department and the court as to the method of reobtaining custody of their child and that, with the permission of the court pursuant to arrangements made by the welfare department, they regularly visited Billy Joe for thirty minutes one day each month at a foster home some one hundred and thirty miles from the Lemaster home.

No further court action occurred until November 22, 1972, when Fran Hoyt, another social caseworker with the department, filed an amended petition with the juvenile court requesting that the department be given permanent custody of the child and the court's approval to consent to his adoption. In addition to the reasons previously alleged, the department sought termination of parental rights because the Lemasters had requested the return of the child. The court held no formal hearing on the amended petition but entered an *ex parte* order continuing the temporary custody of the child in the department.

The respondent alleges in his return that a hearing was intended to be held upon the amended petition but it was continued indefinitely because the parents objected to the proceedings being held without their being afforded court-appointed counsel. The commissioner further alleges that an attempt was made by the court to appoint such counsel but it failed. The relators contend that the court later directed them to counsel willing to represent them, but that counsel had demanded a fee of four hundred and

seventy-five dollars for his services. They alleged the fee was beyond their means and state that they were then, and are presently, pecuniarily unable to afford counsel.

The termination proceeding petition remains pending in the Juvenile Court of Logan County and final proceedings on that petition appear to be imminent, pending the outcome of this original proceeding. It has also been brought to the attention of this Court that during the pendency of the juvenile proceedings, the Lemasters have become parents of a second child, whose name is Betty Joe. She is now eight months old and she is in the care of her natural parents.

The relators contend that the conduct of the neglect proceedings in the Juvenile Court of Logan County without resolution for a period of at least two and one-half years has resulted in an unreasonable denial of lawful custody of Billy Joe to them. Secondly, they contend that by reason of their ignorance of the law and its procedures and because they were unrepresented by counsel and were not advised they could offer evidence at previous hearings, they were prevented from adequately defending their interests at the several temporary custody hearings. Further, that any final hearing which may result in the permanent loss of their custody of Billy Joe without affording them the right to counsel denies them due process of law afforded under Article III, Section 10 of the West Virginia Constitution, and the Fourteenth Amendment to the United States Constitution. They also contend that Code 59-2-1, as amended, secures indigents with the right of appointment of counsel.

In his return, the commissioner admits that the retention of custody of Billy Joe Lemaster without extending a full hearing is an unconstitutional application of Code 1931, 49-6-3, as amended. This Court agrees. The writ must be awarded on this basis in accordance with the extended discussion and rules announced in the recent case of In Re: Willis, 157 W.Va. 225, 207 S.E.2d 129 (1973)

*reh. den.,* February 5, 1974. After the passage of a reasonable time necessarily required to effectuate the State's interest in protecting a child's health and welfare in an emergent situation, the onus for continued retention of the child from the custody of his natural parents falls upon the State and not upon the parents. Clearly, the emergency provision of Section 3 of the statute, has been unconstitutionally applied, in derogation of the rights of the Lemaster parents. Accord, *State ex rel. Bowen v. Flowers,* 155 W.Va. 389, 184 S.E.2d 611 (1971).

We also note our continuing disapproval of a juvenile court's reliance upon unsworn reports of caseworkers employed by the department, whose testimony is not subjected to cross-examination:

> "Reports of the State Welfare Department are not by themselves admissible in evidence at a juvenile court hearing, and any report based on hearsay evidence is generally inadmissible." Syllabus Point 5, *In Re: Simmons Children,* 154 W.Va. 491, 177 S.E.2d 19 (1970).

The new question presented in this case is whether indigent parents are entitled to assistance of counsel in child neglect proceedings which may result in the termination of their parental rights to their natural children?

Prefatory to the disposition of this case, we express our agreement with the attorney general, that due process standards do not always require the appointment of counsel for indigent parents for a temporary change of custody effected pursuant to *Code* 1931, 49-6-3, as amended.

> "In an emergency which imminently threatens the welfare, health or life of any minor child, the State, as *parens patriae,* exercises an interest which temporarily overrides the rights of natural parents to the custody of the child and warrants the assumption that the child's custody by the State for a reasonable time, without regard to the requirements of Due Process." Syllabus Point 3, *In Re: Willis, supra.*

But again, the "reasonable time" parameters discussed in *Willis* express this Court's belief that once the State's immediate interest in protecting the child is satisfied, constitutional regard for the rights of the parents must be acknowledged meaningfully and quickly.

Anytime parents are confronted with judicial proceedings involving the potential termination of their right to the custody of their children, the presented issues and the available defenses are most often exceedingly complex and susceptible of interpretations which may confound the most able legal counsel. Precise concepts involving the determination of (1) destitution, homelessness or abandonment of the child by the parent; (2) lack of parental care; (3) whether the child begs; and (4) whether the child is subjected to an improper environment by reason of neglect, cruelty or disrepute— all severable grounds warranting termination expressed in Chapter 49 of the *Code*—suggest distinctions of subtle and uncommon variety to the semanticist and legal scholar. To laymen parents, in fear of losing children of their body, the words employed in these vague charges are bewildering and paralyzing.

The Supreme Court of Maine recently considered the problem:

> "The statement in Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), that 'even the intelligent and educated layman has small and sometimes no skill in the science of law' would apply to neglect proceedings in the same manner as it applies to criminal prosecutions. The average parent would be at a loss when faced with problems of procedure, evidence, or cross-examination. Statistical studies conducted in other jurisdictions indicated markedly different results between neglect proceedings where the parent has assistance of counsel and those proceedings where the parent is without counsel. See Note, Child Neglect: Due Process For The Parent, 70 Colum. L. Rev. 405, 476 (1970)." *Danforth v. State Department of Health and Welfare,* 303 Me. 794, 799, 303 A.2d 794, 799 (1973).

On the other hand, the contrast between the unrepresented parents' innocence of legal knowledge and the State armed, as it is, with its fiscal resources, expertise in child custody matters, and the services of a salaried prosecuting attorney, is striking and dramatic. Pertinent to this observation is the quote from a respected legal periodical:

> "Among the clearest cases of injustice in the civil process are those in which the state brings suit against an indigent and unrepresented defendant —whether in its role as tax collector, condemnor of property, landlord, or *parens patriae*. The defendant, unable because of his poverty to present his case properly, is overborne by lawyers and other litigative resources paid for out of the public treasury." *Note: The Indigents' Right to Counsel in Civil Cases,* 76 Yale Law Journal, 545, 556 (1967).

Another inhibitive factor to the unrepresented parent in the neglect proceeding is the possibility that he or they may be subsequently charged by the State for the statutory crime of contributing to the neglect or delinquency of a child. *Code* 1931, 49-7-7, as amended. The potential of a criminal charge is oppressive and a parent may anticipate jeopardy arising from his testimony in the neglect proceeding before the officers of the court and the State. Consequently, he may fail to adequately express his true feelings for the child involved and in support of the family relationship. This Court does not ascribe the threat of possible criminal prosecution to the department or other agencies of the State involved in these proceedings. Their responsibility is indeed awesome and their concern for the children and their families served by the State's continuing benevolent interest is not questioned. Indeed, it very certainly embodies a compassion acquired only by those who are constantly faced with the meanest of human problems and who also retain their faith in the better nature of man. We know these agencies would not threaten or charge a crime just to intimidate a parent from contesting a neglect

petition. Recognizing this, we are still compelled to view the actions of the State from the perspective of the indigent unrepresented parent who is threatened with the imminent termination of his right to the care, custody and companionship of his natural children. From that aspect the State appears not as a giver and a helper, but as a taker and a punisher. Poignantly, the Main court recognized the parents' fears:

> "The fact that a parent is not fined or imprisoned as a result of a neglect proceeding does not make the prospect of the loss of custody of one's child anything less than punishment in the eyes of the parent. See Note, Child Neglect: Due Process For The Parent, 70 Colum. L. Rev. 465, 478 (1970). That the State's objective is not penal but directed at providing a suitable home for the child has little effect on the position of the parent. In some instances the loss of one's child may be viewed as a sanction more severe than imprisonment." *Danforth v. State Department of Health and Welfare,* 303 Me. 794, 800, 303 A.2d 794, 800 (1973).

We hasten to add our belief that in most instances the loss of one's child may be viewed as a sanction more severe than imprisonment.

This Court has rejected any distinction between criminal and civil actions of the State in arriving at a determination of whether due process standards require the court appointment of counsel for indigent litigants at State expense. *State ex rel. Wilson v. Bambrick,* 156 W.Va. 703, 195 S.E.2d 721 (1973); *State ex rel. Hawks v. Lazaro,* 157 W.Va. 417, 202 S.E.2d 109 (1974). In these cases, involving an alleged delinquent child and an involuntary commitment under the mental health statutes of this State, respectively, we have recognized that the distinctions between criminal and civil deprivations are irrelevant. Adopting the rationale of *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1970), we have affirmed that constitutional restraints limit State power to terminate fundamental relationships and entitlements

whether the entitlement is denominated a "right" or a "privilege."

Considering the complexity of charges potentially directed to allegedly neglectful parents, the sources available to the State as charging party, the potential for the State viewing the parents' defensive testimony as probative of criminal conduct and the fundamental nature of the parents' rights to the care, custody and companionship of their natural children, we are impelled to hold that a minimum standard of due process requires indigent parents faced with charges of neglect and the potential for termination of parental rights to natural children to be furnished with court-appointed counsel to represent their interest at State expense. The vast majority of reviewing courts of our sister and federal jurisdictions have adopted the precise view which we adopt today. *In Re: Adoption of R. I.,* __ Pa. __, 312 A.2d 601 (1973); *Nebraska v. Caha,* 190 Neb. 347, 208 N.W.2d 259 (1973); *Cleaver v. Wilcox,* __ F. Supp. __, 40 U.S.L.W. 2658 (N.D. Cal. 1972); *Preis v. Wilson,* __ F. Supp. __ (N.D. Cal. 1972); *In re Beaton,* 30 N.Y.2d 352, 334 N.Y. Supp.2d 133, 285 N.E.2d 288 (1972); *White v. Green,* 70 Misc.2d 28 (N.Y.Fam.Ct. 1971); *State v. Jamison,* 251 Ore. 114, 444 P.2d 15 (1968); *Contra: In re Robinson,* 8 Cal. App. 3d 783 (1970).

Having decided the primary issue affirmatively and in a constitutional context, we do not consider the applicability of *Code* 1931, 59-2-1, as amended, to the case at hand.

The writ, as prayed for, is awarded against the commissioner; however, the transfer of custody thus required will be suspended for a period of ninety days to enable the parties, should the department wish to proceed, to initiate and conduct proceedings in accordance with the principles announced herein.

*Writ awarded.*