518 S.E.2d 387

### In re SAMANTHA M.

### No. 25427.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 17, 1999.

Decided July 12, 1999.

Concurring and Dissenting Opinion of Justice Workman July 15, 1999.

---

Keith White, Esquire, Bryant & White, St. Marys, West Virginia, Guardian ad Litem.

Joseph P. Albright, Jr., Esquire, Albright, Bradley & Ellison, Parkersburg, West Virginia, Attorney for Steven S., Father, Appellant.

Ira Haught, Esquire, Harrisville, West Virginia, Attorney for Rebecca O., Mother.

C. Blaine Myers, Esquire, William G. Powell, Esquire, Myers, Powell & Dunbar, Parkersburg, West Virginia, Attorneys for Diana and David M., Grandparents, Appellees.

Darrell V. McGraw, Jr., Attorney General, Barbara L. Baxter, Assistant Attorney General, Charleston, West Virginia, Attorneys for West Virginia Department of Health and Human Resources, Appellee.

PER CURIAM:

This is an appeal by Steven S. from a decision of the Circuit Court of Wood County awarding custody of his natural child, Samantha M., to David M. and Diana M., the child's maternal grandparents. On appeal, Steven S. claims that the circuit court erred in awarding the M.'s custody of Samantha, even though he was Samantha's natural father, and even though no allegation of abuse or neglect had ever been formally asserted or proven against him.

## I.

### Factual Background

Samantha M., the child whose custody is in issue in this case, was born on June 21, 1995, and for the first two years of her life she lived with her mother, Rebecca O., and her maternal grandparents, David M. and Diana M. In June 1997, Samantha's mother, Rebecca O., moved out of the M.'s home and took Samantha with her.

A few days later, on June 11, 1997, Samantha was taken to St. Joseph's Hospital in Parkersburg, West Virginia for treatment of numerous first and second degree burns. The West Virginia Department of Health and Human Resources investigated the circumstances giving rise to the burns and determined that Samantha was in imminent danger while in the care of her mother. The Department, therefore, filed an abuse or neglect petition. The petition, while alleging that Samantha's mother had been guilty of acts which could constitute abuse or neglect, made no such allegations against the appellant, Steven S., Samantha's father, who had not been living with Samantha or her mother.

After the filing of the petition, the Circuit Court of Wood County temporarily placed the legal custody of Samantha with her father, the appellant, Steven S., and at a later hearing, formally ruled that Samantha was a neglected child. Subsequently, on September 12, 1997, the court granted Samantha's mother a six-month improvement period. During this period, the appellant, Samantha's father, retained legal custody of the child although, during most of the time, Samantha actually stayed with the appellant's mother, L.S. The improvement period proved to be a failure as Samantha's mother demonstrated a lack of motivation to alter her behavior, and on April 1, 1998, the circuit court terminated her custodial rights. Sometime prior to this, David M. and Diana M., Samantha's maternal grandparents, had moved to intervene.

In the course of the development of the case, Leann Smith, a Court Appointed Special Advocate, conducted an investigation of the appellant and Samantha's mother, Rebecca O. In the course of the investigation, Ms. Smith learned that the appellant had undergone psychological counseling or treatment relating to his apparent attraction to girls three to six years of age. This counseling or treatment apparently had arisen out of an encounter which he had had with a young girl five or six years previously. As a part of her investigation, Ms Smith reviewed a sexual evaluation of the appellant. Based upon her reading of the evaluation, Ms. Smith concluded that the appellant has "a background of unacceptable sexual tendency towards females aged 3–6 years old." In view of this, and in view of the further conclusion that "Steven agrees that his daughter is at risk in his presence and has expressed his desire to transfer custody of the child to his mother, L... S...," Ms. Smith recommended that actual custody be placed in the custody of the appellant's mother L.S.

After Samantha's maternal grandparents moved to intervene, the appellant objected and specifically argued that he was entitled to the legal custody of Samantha, although it appears that he was willing to have actual custody placed with his mother, L.S. The appellant also filed a "Memorandum in Opposition to Consideration of Evidence Against the Father." The filing of this memorandum was apparently prompted by the submission of Ms. Smith's report suggesting that the appellant had "unacceptable" sexual tendencies, as well as by the motion of Samantha's maternal grandparents, to intervene to obtain custody. In the memorandum, the appellant asserted that as the natural parent of Samantha, he had a paramount legal right to Samantha's custody which could be terminated only in a procedure which afforded him

certain safeguards designed to protect his constitutional rights. He stated that the procedure required that an abuse or neglect petition be filed against him alleging why his rights should be terminated. He claimed that he was entitled to a hearing to address the charges, and finally he alleged that his rights as a father should be considered and protected separately from those of the mother.

During subsequent arguments on the intervention of Samantha's maternal grandparents, as well as on the appellant's claims, the appellant reiterated his claim that he had a paramount right to the custody of Samantha and that the termination of that right could not be considered given the procedural posture of the case. He again specifically claimed that a proper petition charging him with neglect or abuse had not been filed and that he had not been afforded a hearing to challenge any charges against him. He took the position that the report of Leann Smith, the Court Appointed Special Advocate, could not provide a foundation for terminating his rights. His attorney pointed out that Ms. Smith was not a psychiatrist or psychologist and that her recommendation was based on her review of the professional records of others. He argued that her statements were hearsay, and he, in essence, took the position that the appellant had been deprived of the right to cross-examine or otherwise be heard on the factual questions involved.

The attorney appointed to represent the legal interests of Samantha essentially agreed with the appellant's attorney. He stated:

It seems like the threshold for considering the fitness of a non-abusing parent is the filing of a petition, and before that, before a petition is filed, he has the absolute constitutional right of due process; and it doesn't seem like the Court can consider the fitness of a non-abusing parent until somebody has gone through the procedural process that guarantees them due process by filing a petition.

And, you know, maybe the Court could file a petition as a reputable person if the charges were serious enough, but it seems like someone has to file a petition.

Virginia Conley, the Prosecuting Attorney who was representing the Department of Health and Human Resources, also took the position that it would be improper for the court to terminate the appellant's custodial rights in view of the nature of the petition. When questioned regarding her view, Ms. Conley stated that because there were no allegations in the petition against the appellant, it would be improper for the court to terminate the appellant's parental rights.

Ms. Conley also agreed with the claim of the appellant's attorney that the report of Leann Smith, the Court Appointed Special Advocate, could not form a proper basis for terminating the appellant's custodial rights:

THE COURT: So it's the Petitioner's position that the Court should not consider this damaging information that was brought out by the CASA investigation?

MS. CONLEY: Yes, your Honor.

THE COURT: Because it was obtained in violation of Mr. Stephen S . . .'s rights?

MS. CONLEY: Yes, and it's also because it's hearsay and not—It's an interpretation by the CASA worker of information obtained elsewhere. For both of those reasons.

In spite of the appellant's position and the position of Samantha's attorney and the position of the attorney for the Department of Health and Human Resources, the court on August 6, 1998, entered an order finding:

From the evidence the Court does find that Respondent child has two (2) parents who are incapable of caring for her on their own and in fact are in need of strict supervision when they are in contact with their child. The grandparents of the child are the persons, after the parents, who are the most likely suitable persons to have the care and custody of the child. The child was raised with the maternal grandparents from June 21, 1995 to June 5, 1997 and since June, 1997, the paternal grandmother has been the primary caretaker.

The Court further finds that the best interests of the child are paramount and the question before it is what home will give the child the most stable environment and allow the child to maintain contact

with her parents. In that regard the Court notes that the move of the maternal grandmother to Columbus, during the time that she has had the care of the child is a complicating factor.

The court thereupon ordered that the custody of the child be transferred to the child's maternal grandparents.

In the present appeal, the appellant contends that the circuit court erred in refusing to grant him custody of Samantha when no allegation of abuse or neglect was ever made or proven against him.

## II.

### Discussion

In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court of the United States recognized that the natural parent of a child has an interest in the custody of his or her child and that the interest is cognizable and substantial. The Court went on to hold that the State cannot terminate the interest of a natural parent without affording that parent due process of law.

In *In re: Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1974), this Court also recognized that a natural parent's right to the custody of his infant child is a substantial interest that is constitutionally protected, not only by the due process clause of the United States Constitution, but also by the due process clause of the West Virginia Constitution. Further, in Syllabus Point 1 of *In re: Willis,* we stated:

> In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Although we recognized that a natural parent's right to the custody of his child is constitutionally protected, we also recognized that that right is not absolute and that the State can terminate it, or limit it, if the parent is proved to be unfit in a proceeding which affords the affected parent due process of law. We said:

> One of the basic constitutional guarantees of due process is, of course, that no one shall be deprived of a substantial right by an arm of the State without notice and the opportunity to be heard in a meaningful manner. See *State ex rel. Payne v. Walden,* 156 W.Va. 60, 190 S.E.2d 770 (1972). Code 1931, 49-6-2, as amended, recognizes and accords the right of notice and the opportunity to be heard to the parents of a child whose custody is sought to be taken by the state department of welfare or another person because of neglect. The case of *In re: Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966 [1967]), established the principle that fundamental due process requires the notice of an adjudicatory hearing to the parties affected in a juvenile proceeding. Well before *Gault* was decided, however, this Court held in the case of *In re: Sutton,* 132 W.Va. 875, 53 S.E.2d 839 (1949), a parent could not be divested of his parental rights without notice and opportunity for a hearing when such parent was subject to the jurisdiction of the court and available for service of process; and any such hearing held divesting the parent of his rights to his child resulting in a decree, was void and of no effect. This is the undoubted law in this jurisdiction and elsewhere, mandated by our own as well as the Federal Constitution, and it operates to prevent the permanent termination of parental rights without according the full range of due process guarantees to the affected persons.

*In re: Willis, id.* at 239–40, 207 S.E.2d at 138. We also concluded: "The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof." Syllabus Point 6, *In re: Willis, id.*

W.Va.Code 49-6-1, *et seq.* (1998), provides a mechanism for testing and determining whether a natural parent is, in fact, a fit person to have the care and custody of his natural child. The statutory provisions pro-

vide mandatory procedures to ensure that the parent is accorded the required due process of law in the testing and determination procedure. *See State v. T. C.*, 172 W.Va. 47, 303 S.E.2d 685 (1983).

The statutory scheme established by W. Va.Code 49-6-1, *et seq.* (1998) requires that any proceeding designed to alter a natural parent's custodial rights be initiated by the filing of a petition alleging specific conduct constituting the statutory definition of neglect or abuse which would justify termination of the natural custodial parent's rights. Further, it is required that the petition be served upon both custodial parents. Relating to the contents of the petition, W. Va.Code 49-6-1(a) (1998) provides:

> The petition shall be verified by the oath of some credible person having knowledge of the facts. The petition shall allege specific conduct including time and place, how such conduct comes within the statutory definition of neglect or abuse with references thereto, any supportive services provided by the department to remedy the alleged circumstances and the relief sought.

1. The petition alleged:

> 3) The health, safety, and welfare of the above-named child is harmed and threatened by the *respondent-mother's unwillingness or inability to provide her with supervision and necessary and timely medical care.* This is shown by the following circumstances:
>
> (a) Samantha M . . . was presented to St. Joseph's Hospital by a neighbor, Misty Postlewaite at 11:12 a.m. on June 11, 1997 with second degree burns to her right hand, two first degree burns to her right forearm, a first to second degree burn to her posterior left thigh, and a first degree burn to her lateral left leg. The burn marks varied in length and size and several were blistered.
>
> (b) The medical personnel were presented with information at [sic] the burn injuries were caused by the child getting an unplugged iron off of a dresser, plugging it in and burning herself at approximately 2:00 p.m. the previous day, June 10, 1997, while in the custody and control of the respondent mother.
>
> (c) The petitioner interviewed the respondent mother and she reported that the child, SAMANTHA M . . ., while at the residence located at 554½ 6th Avenue, Parkersburg had pulled an iron off of the dresser, crawled behind the couch, plugged in the iron and

In interpreting the requirement that specific facts be alleged in the petition, this Court has held that conclusory statements are insufficient and that the petition must show facts. *State v. Scritchfield*, 167 W.Va. 683, 280 S.E.2d 315 (1981); *see also In re: Simmons Children*, 154 W.Va. 491, 177 S.E.2d 19 (1970). The purpose of requiring specific allegations is to afford the charged parent with notice of why the termination proceeding is being conducted and to afford him an opportunity to address the charge. *See In re: Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995). Such a procedure is, in effect, required to guarantee that the parent will not be deprived of his custodial rights without due process of law as is required by *Stanley v. Illinois, supra,* and *In re: Willis, supra.*

■ The original petition in the present case asserted that Samantha's mother and father lived at different addresses, and, while alleging in detail that Samantha's mother had been derelict in her care of Samantha, it, in no way, made any specific allegation as to conduct on the part of Samantha's father, the appellant, Steven S ., which rendered him unfit to have custody of Samantha.[1]

> burned herself with the iron at approximately, 2:00 p.m., the day before she was presented to the hospital.
>
> (d) The neighbor, MISTY POSTLEWAITE, reported to the petitioner that she has heard different explanations from the respondent mother as to how these injuries occurred. MISTY POSTLEWAITE informed the petitioner that the respondent mother on June 10, 1997 at approximately 9:00 p.m. described the injuries to the child as one burn. The following morning, June 11, 1997, MISTY POSTLEWAITE saw the multiple burns on the child and questioned the mother as to why the child was not taken to the doctor and the mother indicated that the child was fine and was more concerned with her own doctor's appointment. MISTY POSTLEWAITE insisted that the child be taken to the emergency room for medical attention and even offered to take the child. The respondent mother agreed, but asked MISTY POSTLEWAITE to lie about how the injuries occurred.
>
> (e) Due to the seriousness of the injuries, the reluctance of the mother to obtain medical treatment and the request of the mother to cover up the truth about how the injuries occurred, *it is the belief of the petitioner that this child is in imminent danger.*

An amended petition was filed with the court on June 24, 1997. The amended petition contained extensive details of the burn suffered by Samantha while she was in the care of her mother, but it again included no specific allegation relating to conduct by the appellant, Samantha's father, which might render him unfit to have custody of the child.[2]

After examining the original petition, as well as the amended petition, we believe that although they contain specific allegations sufficient to notify Samantha's mother of the reasons why the State was moving to deprive her of the legal custody of Samantha, they contained no allegations which would have informed Samantha's father, the appellant, of reasons for terminating his custodial rights.

During the ensuing development of the case, the trial court received a report from Leann Smith, the Court Appointed Special Advocate, relating to the Special Advocate's investigation of Samantha's mother and father. In that report, Ms. Smith stated that through discussions with persons other than the appellant, she had learned that the appellant had "a background of unacceptable sexual tendency towards females age 3–6 years was revealed about Steven." On the basis of her examination of the appellant's psychological records, Ms. Smith stated:

In the best interest of the child in quickly establishing a safe, permanent home, I am recommending permanent rather than temporary custody be transferred because if at a later time the natural father would choose to petition for custody, I feel that the burden of proof should be placed on him due to his prior behaviors.

The appellant's actual medical and psychological records were never introduced into evidence, and no evidence, other than the report of Ms. Smith, was ever introduced to show exactly what the appellant's condition was or what his sexual propensities were.

To complicate matters, the court, in apparent response to the arguments relating to the hearsay and possibly unreliable nature of Ms. Smith's findings as bearing on the fitness of the appellant, ruled that:[3]

That the court will not consider a portion of the CASA report which reflects the CASA worker's characterization of the results of a psychological evaluation that was performed on the father, Steven S..., or hearsay comments made by the respondent-mother and maternal grandmother.

It thus appears that the only factual basis for the trial court's terminating the appellant's custodial rights was Ms. Smith's statement that "Steven agrees that his daughter is at risk in his presence and has expressed his desire to transfer custody of the child to his mother, L... S...." This statement apparently was not a spontaneous, independent utterance, but a response to a statement made by Ms. Smith. It also was apparently made in the context that actual custody would be placed in the appellant's mother. When it became apparent that it might be used to terminate the appellant's legal right to custody in this case, the appellant's attorney strenuously objected to its use.

In this Court's view, the evidence did not rise to the level of clear, cogent, and convincing proof required by Syllabus Point 6 of *In re: Willis, supra,* to terminate a natural parent's legal custody rights.

West Virginia's statutory and case law, which is designed to implement the constitutional requirement that a natural parent be deprived of his custodial rights only after

---

2. The amended petition, after detailing the circumstances surrounding the burn of Samantha, again concluded with the allegation that:

Due to the seriousness of the injuries, the reluctance of the mother to obtain medical treatment and the request of the mother to cover up the truth about how the injuries occurred, it is the belief of the petitioner that this child is in imminent danger.

3. About the hearsay nature of the evidence, even the attorney for Samantha had stated:

[M]y position is that you have a person who, as far as we know, is not qualified to interpret a psychological report giving a one sentence evaluation of a psychiatric report done by an expert, and we don't—I don't think that report's been introduced into evidence. You know, there could have been things taken out of context. How do we know, you know, what kind of evaluation or what really the psychiatrist or psychologist, what their conclusion was in regard to Mr. S... even if this evidence is admissible.

notice, requires that a proceeding be instituted by petition specifically charging him with derelictions which can form the basis for terminating the rights. See, W. Va.Code 49–6–1 (1998); and *State v. Scritchfield, supra.* Here, the required allegations were not set forth in a petition against the appellant. Likewise, our legal requirement that the derelictions be proven by clear, cogent, and convincing proof was not met.[4] We, therefore, conclude that the judgment of the Circuit Court of Wood County must be reversed, and this case must be remanded for reconsideration of the custody question. In reaching this conclusion, the Court is guided by our law which requires that due process of law must be accorded a natural parent before his custodial claims may be overridden. The Court is rendering no judgment on the fitness of the appellant to have custody of Samantha and is, in fact, concerned about the report of the appellant's tendencies. However, the Court believes that the attorney for the Department of Health and Human Resources correctly noted that if the evidence relating to the appellant's condition seriously suggests a possibility of harm to Samantha, the court, or another reputable person, may yet file a proper petition bringing into issue the propriety of the appellant's having legal custody of Samantha, and if, in fact, inquiry into the nature of the appellant's condition suggests that the condition would likely result in abuse or neglect to Samantha, the Court believes that an appropriate petition should be filed.[5]

Also, since a petition has been filed in this case, and since Samantha's mother, who previously had custody of the child, has been adjudicated unfit, the trial court has a broad range of interim dispositional alternatives available, short of returning Samantha to the unsupervised custody of the appellant, pending final resolution of this case. W. Va.Code 49–6–5 (1998).

In summary, the Court believes that because the circuit court failed to follow the requirements of W. Va.Code 49–6–1, *et seq.* (1998), before denying the appellant custody of Samantha, the judgment of the circuit court must be reversed, and this case must be remanded with directions that the question of the custody of Samantha be reconsidered. On remand, the court or any reputable person may call into question the propriety of vesting custody in the appellant, but before the appellant may be denied custody, the appropriate statutory procedures must be followed, and the appellant's unfitness for custody must be established by clear, cogent, and convincing evidence.[6]

Reversed and remanded.

4. In arguing about the procedure in the case, the appellant's attorney stated:

> And all of the procedural safeguards that are afforded, he's had not a single one of them, Judge, not a single one of them, because nobody's filed a petition and we've had no adjudication, we've had no cross-examination, we've had none of the procedural safeguards that he *is entitled to just like the mother was entitled to.* They have charged—there is nothing he has done to this child. Nothing. They're talking about adversely affecting his rights because of fantasies, fantasies that are reported by a report. There's been no testimony presented about it. There's been no cross-examination, been no opportunity for such.

The attorney for the Department of Health and Human Resources characterized what occurred here as follows:

> [T]here are no allegations against Stephen S...; this report and bringing all this up are promoting allegations before—even if the things that have been raised are true, that's never been charged against him. It's like pulling someone off the street who's been charged with nothing, bringing them in here and evalu-

ating their life, and I just don't think that's proper to do in these proceedings.

5. The attorneys in this proceeding appear to question whether a party having a mental condition may be adjudicated unfit if he has never actually committed an act of abuse or neglect. We addressed this problem in *State v. Scritchfield,* 167 W.Va. 683, 280 S.E.2d 315 (1981). We recognized that, under certain circumstances, it could if the nature of the condition would likely result in abuse or neglect. We, however, outlined procedural steps which had to be followed before an adjudication could be made. Rather clearly, the procedure discussed in *Scritchfield* was not followed in the present case.

6. The Court notes that there is some evidence that one of Samantha's maternal grandparents, Diana M., previously had custody of her own children removed from her after an abuse or neglect proceeding had been filed. The Court believes that before she is vested with custody of Samantha, if the appellant's rights are terminated, the full nature of the previous proceeding, as it might impact upon her fitness to have custody of Samantha, should be explored.

WORKMAN, Justice, concurring, in part, and dissenting, in part.

(Filed July 15, 1999)

I am disheartened by this case. It is fairly amazing that there was a prosecuting attorney charged with the responsibility of representing the Department of Health and Human Resources (whose duty it is to protect children from abuse and neglect) and a guardian ad litem, a lawyer whose function it is to protect the rights of the child. Yet even after the father is alleged to have *acknowledged* that he has a problem with respect to being sexually attracted to girls age three to six years of age (and, by the way, his daughter is approaching that age group), and even though the father is alleged to have *acknowledged* that his daughter would be at risk of sexual abuse in his custody, no one (repeat, no one!!) moves to amend the petition or file a new petition to have this issue addressed. Did the DHHR, the prosecuting attorney, and the guardian ad litem feel their job was to advocate for the father or one of the grandparents? Their job was to protect the child! Do they all just feel you have to wait and let the sexual abuse happen, and then deal with it? Why didn't someone make a motion to amend, or even file a new petition to get this issue addressed? For instance, Rule 19 of the Rules of Procedure for Child Abuse and Neglect provides that "[t]he court may allow the petition to be amended at any time until the final adjudicatory hearing begins, provided that an adverse party is granted sufficient time to respond to the amendment. After the final adjudicatory hearing begins, a petition may be amended if the amendment does not prejudice the adverse party." *See* Syl. Pt. 4, *State v. Julie G.,* 201 W.Va. 764, 500 S.E.2d 877 (1997) (stating that "intent underlying Rule 19[is] to permit liberal amendment of abuse/neglect petitions").

The judge, to his credit, *tried* to establish some protection for the child by removing her from the father's physical custody and giving him supervised visitation rights. Unfortunately, since the lawyers who should have been protecting Samantha sat on their duffs on this issue, there was a better way for the judge to have handled it. Although

certainly the court was correct in its determination that, once the child was adjudicated neglected or abused, as she was, that the court has a number of dispositional alternatives, a better record was needed to support the decision to place the child with a grandparent and give the father supervised visitation only. *See* W. Va.Code § 49–6–5 (1998) (concerning types of dispositional alternatives). In an attempt to protect Samantha, the court attempted to craft a plan that would not deprive the father of his parental rights, but would require supervision (by the paternal grandmother) while he was visiting with the child. The better course, upon receipt of information concerning the father's sexual propensities toward children, in the absence of the child's advocates doing anything, was to have either (1) directed the DHHR to make a full inquiry and ordered a psychological examination on the father; and (2) invited the amendment; or (3) given the father notice that a hearing would be set on these allegations, while at the same time requiring that the allegations be placed in writing so that the father would be fully informed of them.

After eighteen and one-half years as a judge, I continue to be amazed at the seeming ineptitude of the social services and legal systems on frequent occasions to truly protect children from abuse and neglect. I previously expressed this concern in *State ex rel. Diva P. v. Kaufman,* 200 W.Va. 555, 490 S.E.2d 642 (1997) (Workman, J., concurring) where I stated that

> I have seen the department fail to protect children and fail to advocate vociferously for them on many occasions. In addition, although guardians ad litem are appointed to represent children, most of them until relatively recently, did not do much aggressive advocacy either, frequently not even appearing on appeal on behalf of the children.

*Id.* at 569, 490 S.E.2d at 656.

If a correctional officer indicated that he had a propensity to sexually assault or abuse inmates, or otherwise to mistreat them, and that inmates in his charge might be at risk, the system would jump *pronto* to see to it that persons confined in our jails and peni-

tentiaries are not mistreated by such an individual. Yet the DHHR in its brief on appeal expresses great concern for the constitutional due process rights of the father and concern for his legal right to custody of his daughter. The father had a lawyer who more than adequately took care to protect his rights. But who was there to protect Samantha's rights? It would be interesting to learn whether the DHHR has done anything since the proceedings below to seek to have her protected, or at least to conduct further inquiry into the potential danger she may be exposed.

Thus, I suggest that the majority erred in not affirmatively directing the lower court to make inquiry into this matter on remand, and to require that the information gained by the Court Appointed Special Advocate concerning the risk to the child be the subject of a formal petition and a hearing thereon.* Our statutes are clear that whenever a child appears in court, that child is a ward of that court. That court has both a right and a responsibility to see to it that the child is protected. *See Julie G.*, 201 W.Va. at 776, 500 S.E.2d at 889 (Workman, J., dissenting) ("Furthermore, whenever a child appears in court, he is a ward of that court. W. Va. Code § 49-5-4 (1996); *Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992). Courts are thus statutorily reposed with a strong obligation to oversee and protect each child who comes before them.").

Judge Hill tried to fulfill this duty, but got no help from the DHHR, the prosecuting attorney, or the child's guardian ad litem. The majority knocks itself out protecting the father's rights without recognizing this Court's duty to also protect the child.

---

* Although the majority points out that such inquiry may be done on remand, they are rather blasé with respect to whether this should occur.