591 S.E.2d 168

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**DAMIAN R., Defendant Below, Appellant.**

**No. 31116.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 2003.

Decided Nov. 21, 2003.

612

Christopher C. Quasebarth, Assistant Prosecuting Attorney, Martinsburg, for Appellee.

John P. Adams, Esq., Public Defender Corporation, Martinsburg, for Appellant.

STARCHER, C.J.

In the instant case we reverse a circuit court's order transferring custody of a juvenile from his parent to the Department of Health and Human Resources and authorizing his placement out of his home—because the Department did not show the necessity for such an order.

I.

*Facts & Background*

The appellant, D.R. (hereinafter "the juvenile"), was born on September 4, 1987, and was fourteen years old at the time of the proceedings below. During the 2001–2002 school year the juvenile resided with his mother in Berkeley County, and was enrolled in the seventh grade. The juvenile had truancy and anger management problems at school; in the Fall of 2001 he was expelled from school and the school system offered him alternative educational services on two nights a week after school. A truancy diversion social worker was assigned to work with the juvenile and his family. The juvenile

attended some of the alternative education sessions, but missed most of them.[1]

In late 2001, the juvenile's mother, seeking further assistance in dealing with her problems with her son,[2] consulted with the Berkeley County Prosecuting Attorney's Office. As a result of this consultation and with the mother's consent, on December 12, 2001, the Berkeley County Prosecuting Attorney filed a petition pursuant to *W.Va.Code*, 49–5–7 [1998], requesting that the juvenile be adjudged to be a status offender.

A probable cause hearing was held by the circuit court on January 29, 2002, where a truancy diversion social worker and the juvenile's mother testified briefly to the juvenile's misconduct. The social worker testified that the juvenile would benefit from counseling; the mother testified that while the juvenile's behavior had already improved noticeably since the petition was filed, the mother still felt she needed help from the court. The circuit court ruled that probable cause had been established and set a date about one month later for an adjudicatory hearing.

On February 27, 2002, the circuit court held the adjudicatory hearing. There was no evidence presented of any further misconduct by the juvenile since the probable cause hearing. The juvenile's counsel advised the court that the juvenile would admit to the factual allegations in the petition and that the juvenile wished to remain with his mother. The circuit court questioned the juvenile to be sure that he understood his rights and then accepted the juvenile's acknowledgment of the truth of the allegations in the petition.

The circuit court entered an order adjudicating the juvenile as a status offender, based on incorrigibility and truancy. The court referred the juvenile to the West Virginia Department of Health and Human Resources ("DHHR") "for treatment according to statute." The court also ordered a psy-

chological examination of the juvenile. The court cautioned the juvenile that his truancy was unacceptable; that he needed above all to attend school regularly; and that he would face more serious consequences if he did not attend school as required.

After this hearing the juvenile began to attend school again. Then, on March 1, 4 and 7, the juvenile reportedly "acted out" in school, by yelling at a teacher and not following directions. The school contacted the DHHR, and on March 15, 2002 the DHHR filed a petition with the circuit court, briefly describing the reported "acting out" incidents and further alleging that "[t]he Juvenile is not amenable to services in the community because he will not remain in a safe residence long enough for services to be offered nor is there a community service available that can supervise the Juvenile to prevent him from skipping school, being incorrigible, and running away, so therefore it is in the best interest of this fourteen-year-old Juvenile if he is placed in the custody of the Department and placed in a staff secure facility." The DHHR sought an order awarding custody of the juvenile to the DHHR for out-of-home placement.

A hearing on this petition was held on March 25, 2002, following which the circuit court entered an order—without making any specific written findings—granting custody of the juvenile to the DHHR for the purpose of making placement at a place to be determined, and pending such placement ordering that the juvenile be held at the Romney Child Care Center.

At the March 25, 2002 hearing, the prosecutor presented testimony from two witnesses. The prosecutor's first witness was a youth services supervisor for the Children's Home Society ("CHS"), a private organization to whom the DHHR had referred the juvenile, apparently pursuant to a contract between the CHS and the DHHR. This wit-

1. The juvenile's mother, a single parent, worked in the evenings and attended college classes during the day. The school offered her some transportation assistance in getting the juvenile to and from school in the evenings, but, the mother told the court, the promised assistance had not eventuated. The mother also told the court that the juvenile had refused to go to some alternative

education sessions at times when the mother could provide transportation.

2. These problems included emotional outbursts, not following household rules, throwing things, not saying where he was going when he left the house, smoking marijuana; and, as previously noted, refusing to go to school.

ness testified that her agency had been telephonically advised of the "acting out" incidents in early March by the school system. The CHS supervisor testified that she had no personal knowledge of what had happened in the school; that she had not spoken to the juvenile or his mother about the incidents; and that her agency had not provided any services to the juvenile or his family since the adjudication. The prosecutor's second witness was a DHHR foster care worker. This witness testified that she had filed the most recent petition after receiving reports of the juvenile's acting out in school, but that she had no personal knowledge of the subject matter of the reports.

The juvenile's lawyer objected to the hearsay nature of both witnesses' testimony. In response to these objections, the prosecutor told the circuit court that she had subpoenaed the school personnel who reported the conduct, but that they had not yet come to the courtroom.

The circuit court overruled the hearsay objections. Then, after a brief recess, the prosecutor stated that the school personnel witnesses had not been served with subpoenas. The prosecutor did not request a continuance to secure these witnesses' testimony, and rested her case. The juvenile's lawyer did not present any witnesses.

Both sides then summed up. The prosecutor asked for giving custody of the juvenile to the DHHR and placement of the juvenile outside the home on the grounds that the juvenile had misbehaved so soon after the adjudicatory hearing. The juvenile's counsel stated that the juvenile wanted to remain at home and that his mother wanted him to remain at home. The juvenile's counsel further stated that the juvenile's mother had invoked the court system and the juvenile had waived an adjudicatory hearing on the premise that the juvenile would get evaluation and counseling services—which had not been provided. The juvenile's lawyer argued: "We haven't given him the benefit of those services. We haven't even tried to see if it could work at home."

The circuit court granted the DHHR's petition for custody, telling the juvenile that he had "flagged your nose at the Court." After the Court's ruling, the juvenile's mother addressed the court, and the following colloquy occurred:

MOTHER: Your Honor, can I say something?

THE COURT: Sure.

MOTHER: You know, I want nothing but the best for him, and I came to this court system seeking help for him. But, you know, I can't expect my son to do anything when—I mean, this is not referring to you or Ms. Neely. I was very pleased with both of you when I left here last time.

I can't expect him to do his part when the state didn't do their job. And from the bottom of my heart, they didn't do their job. I have also contacted them last week. I was told it's in somebody else's hands. I contacted one this morning, it was in the other hands. How do you know what to do when no one wants to take that responsibility? And to me, I think they did a very poor job. I'm sorry. And I have to say it. They didn't do their part with him. And now I think when he walks out of here, he is not going to—not even going to want to try. Because if I walked out of here today and got the treatment that I did, I wouldn't have no trust in the system either. They didn't do their job. Without even asking him why the incidents started in school. They never even investigated why. The teacher said I don't have to put up with anything from a punk like you. I would have been upset at that teacher too. Yes, he handled it wrong by going off the way that he did. He should have went out, went to the office and called me or his attorney.

JUVENILE: Well, they wouldn't let me.

MOTHER: But it's not fair for them to do it all to him and then he can't fight back. Just like with the state. Youth Services and DHHR, they didn't do their job. How do they expect a child to do their's?

THE COURT: [Juvenile], did you want to say anything?

JUVENILE: They wouldn't let me leave the room to call her or my mother.

MOTHER: He had the card in his wallet to call Ms. Davis and they would not even

let him leave the room to make a phone call. No services have been offered him. When I left here that last time I gave them every number to contact me and everything. Yes, there was an incident. Why didn't they contact me that day? I went to the school on all three incidents. I wanted to find out what was wrong. Why didn't they do their job and investigate it? They should have to see. They could have came to him and said what happened [Juvenile], you know. Not just sign a piece of paper and collect your paycheck on a Friday. This is a juvenile. I'm sorry. When he's in the right, he's in the right. And for them to take him out of my home is not fair.

THE COURT: All right. Ms. Games–Neely, anything further?

MS. GAMES–NEELY: No, sir.

THE COURT: Ms. Davis, anything further?

MS. DAVIS: No, Your Honor.

THE COURT: All right. Hearing nothing further then we will adjourn, counsel. Do you have an order, Ms. Games–Neely?

## II.

### Standard of Review

The appellant juvenile raises two related issues on appeal. First, he argues that the hearsay evidence in the March 25, 2002 hearing regarding his alleged misbehavior was inadmissible; and that even if admissible, this evidence could not form a basis for tak-

ing him out of the custody of his mother. This argument is framed on both statutory and due process grounds. The appellant also argues, on similar grounds, that awarding custody to the DHHR was improper because the DHHR had not even attempted to provide the services that would be a less restrictive alternative than removal from his mother's custody.[3] Both of these issues raise matters of law that we address *de novo*.

## III.

### *Discussion*

### A.

### *The Removal of the Juvenile From His Parent's Custody and Home*

The proceedings at issue in the instant case alleged that the juvenile was a "status offender"—i.e., a child whose complained-of conduct would not be a crime if the conduct was engaged in by an adult.[4] The circuit court's post-adjudication order referring the juvenile to the DHHR was dictated by the provisions of *W.Va.Code*, 49–5–11 [1998], which states in part:

(d) If the allegations in a petition alleging that the juvenile is a status offender are admitted or sustained by clear and convincing proof, the court shall refer the juvenile to the department of health and human resources for services, pursuant to section eleven-a of this article and order the department to report back to the court with regard to the juvenile's progress at least every ninety days or until the court,

---

3. Following the circuit court's order, the juvenile apparently spent about a month away from home at a juvenile facility for status offenders and then was returned home, although his legal custody apparently remains with the DHHR and the juvenile's placement is stated to be at their discretion. The issues in this case are therefore not moot.

4. *W.Va.Code*, 49–1–4(14) [1998] states:

(14) "Status offender" means a juvenile who has been adjudicated as one:
   (A) Who habitually and continually refuses to respond to the lawful supervision by his or her parents, guardian or legal custodian such that the child's behavior substantially endangers the health, safety, or welfare of the juvenile or any other person;

(B) Who has left the care of his or her parents, guardian or custodian without the consent of such person or without good cause;
   (C) Who is habitually absent from school without good cause; or
   (D) Who violates any West Virginia municipal, county, or state law regarding use of alcoholic beverages by minors;
   *W.Va.Code*, 49–1–1(a)(9) [1998] establishes "juvenile delinquent" and "status offender" as separate and distinct categories. In the seminal case of *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 233 S.E.2d 318 (1977), Justice Neely set forth the constitutional requirements for the treatment of status offenders. A core conclusion of *Harris v. Calendine* was that courts may not impose remedies upon status offenders that are punitive in nature ("they must be helped and not punished"), 160 W.Va. at 182, 233 S.E.2d at 326.

upon motion or sua sponte, orders further disposition under section eleven-a of this article or dismisses the case from its docket.

(e) If the allegations in a petition are not sustained by proof as provided in subsections (c) and (d) of this section, the petition shall be dismissed and the juvenile shall be discharged if he or she is in custody.

(f) Findings of fact and conclusions of law addressed to all allegations in the petition shall be stated on the record or reduced to writing and filed with the record or incorporated into the order of the court.

The referral from the circuit court pursuant to *W.Va.Code*, 49–5–11(d) [1998] triggers a duty by the DHHR to provide services to the juvenile, under the mandate of *W.Va. Code*, 49–5–11a [1998], which states in part:

(a) Services provided by the department for juveniles adjudicated as status offenders shall be *consistent with the provisions* of article five-b of this chapter [49–5B–1] and shall be designed to develop skills and supports *within families* and to resolve problems related to the juveniles or conflicts *within their families.* Services may include, but are not limited to, referral of juveniles and parents, guardians or custodians and other family members to services for psychiatric or other medical care, or psychological, welfare, legal, educational or other social services, as appropriate to the needs of the juvenile and his or her family.

(Emphasis added.)

(b) If necessary, the department may petition the circuit court:

(1) For a valid court order, as defined in section four, article one of this chapter, to enforce compliance with a service plan or to restrain actions that interfere with or defeat a service plan; or

(2) For a valid court order to place a juvenile out of home in a nonsecure or staff-secure setting, and/or to place a juvenile in custody of the department.

The DHHR's petition for custody in the instant case is grounded in the language in the foregoing-quoted statute authorizing the DHHR to "[i]f necessary ... petition the circuit court [to] ... place a [referred status offender] out of home in a nonsecure or staff-secure setting, and/or to place a juvenile in custody of the department." *Id.*

The appellant suggests that as a matter of law and in all cases, in order for the DHHR to seek under *W.Va.Code*, 49–5–11a(b)(2) [1998] to have custody of an adjudicated status offender transferred from the child's parent to the DHHR—as a quasi-jurisdictional and necessary precursor for such a request, the DHHR must first have provided services to the juvenile and his or her family while the juvenile is in the parent's home and custody, and the DHHR must show that these in-home services have been ineffective, thus rendering a further court order "necessary."

However, such a reading of *W.Va.Code*, 49–5–11a [1998] is not compelled by the language of the statute, nor would such a reading comport with common sense. Certainly there could be a severe case in which the provision of services to a status offender necessarily requires, in the first instance, an order placing a juvenile out of his or her parents' custody or home in the first instance—such as when a juvenile's parent is gravely ill, for example.

Having said this, however, we must emphasize that the entire statutory scheme for status offenders contemplates that removal from the home and/or transfer of custody from a parent be undertaken only when necessary and upon clear and convincing proof that no less restrictive alternative is feasible.

■ The removal of a juvenile status offender or delinquent from his parent's custody is authorized "only when the child's welfare or the safety and protection of the public cannot be adequately safeguarded without removal ...." *W.Va.Code*, 49–1–1(a)(12)(b) [1999].[5] While the 1997 revisions to the child welfare statutes "grant courts broader dis-

---

**5.** Additionally, *W.Va.Code*, 49–5–13(b)(4) [1999], which applies to delinquents and not status offenders, requires the court to determine whether the Department made reasonable efforts to pre-

vent an out-of-home placement before such a placement may be ordered. Certainly there is no less of a requirement for status offenders.

cretion in determining the precise placement for status offenders that will meet the best interests of the juvenile and the community[,]" *State ex rel. Ohl v. Egnor,* 201 W.Va. at 785, n. 13, 500 S.E.2d at 898, n. 13 (1997), the requirement of selecting the least restrictive appropriate alternative remains. *Id.*[6]

█ Based on the foregoing, we hold that the prior actual provision of services by the State Department of Health and Human Resources to a status offender is not in all cases a jurisdictional prerequisite for the filing of a petition seeking an order transferring custody of the status offender to the Department and/or out-of-home placement under *W.Va. Code,* 49–5–11a(b)(2) [1998]; however, such a petition may only be granted upon a showing by clear and convincing evidence that such a custody or placement order is actually necessary; that the effective provision of services cannot occur absent such an order; and that all reasonable efforts have been made to provide appropriate services without an out-of-home placement and/or custody transfer; additionally, orders granting such placement or transfer must be based on specific findings and conclusions by the court with respect to the grounds for and necessity of the order.

6. These principles are well-rooted in our case law as well. In Syllabus Point 1 of *In Re Samantha M.,* 205 W.Va. 383, 518 S.E.2d 387 (1999) (*per curiam*), we recognized the fundamental interest that a parent has to the custody of their infant child; reiterating Syllabus Point 6 of *In Re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973):

In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

We stated in Syllabus Point 2 of *Samantha M.* that the standard for a court order limiting or terminating parental rights to the custody of minor children is clear, cogent, and convincing proof.

7. Additionally, no evidence showed that the DHHR had, prior to filing its post-adjudication petition for custody and placement, attempted to implement any less restrictive alternative. A lecture from a trial judge and "fear of consequences" is not the provision of rehabilitative

█ Applying the foregoing principles to the facts of the instant case, we first note that the DHHR was required upon receipt of the initial referral from the court to establish an individualized plan of rehabilitation for the juvenile, *W.Va.Code,* 49–5B–4(b) [1999]. No evidence was adduced regarding the establishment of such a plan in the instant case. Moreover, while the DHHR alleged in its post-adjudication petition for custody and transfer that "services were provided to the Juvenile by the Children's Home Society of West Virginia[,]" and that "[t]he juvenile will not remain in a safe residence long enough for services to be provided nor is there a community service available that can supervise the Juvenile to prevent him from skipping school, being incorrigible, and running away... [,]" in fact none of these allegations were addressed, much less proven, at the March 25, 2002 hearing.[7]

We recognize that the circuit court in the instant case, faced with an agency that had apparently not even begun to do its assigned job, decided to "bring matters to a head" and "take the juvenile in charge." However, the evidence at the March 25, 2002 hearing did not legally establish the *necessity*—for the protection of the juvenile or the public—of transferring legal custody of the juvenile to the DHHR and removing him from his home.

services that the DHHR is required to deliver to status offenders. In the instant case, the DHHR had a responsibility after adjudication to promptly meet with the juvenile and his parent and to discuss how to implement a home-based services plan. Certainly, after the first reported incident at school of March 1, 2002, the DHHR was on notice of a pressing need to immediately begin to work with the juvenile to try to avoid further incidents in school—or to return to an effective alternative education plan. Nothing in the record demonstrates any such attempt.

In *In Re Edward B.,* 210 W.Va. 621, 558 S.E.2d 620, (2001), a neglect and abuse case, we stated that "[a]lthough a family case plan was formulated and submitted to the lower court prior to the dispositional hearing, the strategies recommended in the plan were never employed to address the family's problems." 210 W.Va. at 633, 558 S.E.2d at 633. *See also See State ex rel. Ohl v. Egnor,* 201 W.Va. 777, 788, 500 S.E.2d 890, 901 (1997) (DHHR in status offender case "failed miserably in carrying out its duties to assist the Court;" DHHR's actions were "totally inconsistent with DHHR's mandatory duties to assist the circuit courts ...").

For this reason, the circuit court's order removing the juvenile from his parent's custody and transferring it to the DHHR and placing him out of his home must be reversed.

### B.

### *The Hearsay Evidence Issue*

The appellant juvenile also argues that the circuit court erroneously admitted and relied upon hearsay evidence in the March 25, 2002 hearing as the basis for its placement and custody order.

Our review of the record leads us to the conclusion that the circuit court overruled the juvenile's counsel's objections to the hearsay evidence of the appellant's misconduct in school principally because the two witnesses were testifying to the fact that they had received oral reports from school officials—and because the prosecutor represented to the court in connection with these witnesses' testimony that school officials would testify directly about the incidents of misconduct. In other words, the circuit court allowed the hearsay evidence to be presented primarily to lay a foundation for expected first-hand evidence.

However, when the two school official witnesses failed to arrive because they had not been subpoenaed and the prosecution rested without seeking a continuance, the circuit court had only a minimal quantity of hearsay (perhaps even "double hearsay") about the incidents at the school. As a result, the juvenile's counsel was unable to cross-examine any of the witnesses who testified about the incidents or the context in which the incidents had occurred.

This court has addressed the issue of hearsay evidence in proceedings involving juveniles in several contexts. In the abuse and neglect context, in *In Re Simmons Children,* 154 W.Va. 491, 177 S.E.2d 19 (1970), we stated in Syllabus Points 1 and 5 that:

1. Although the hearings in a juvenile court are not usually held to the same strict rules of procedure as ordinary cases, the basic requirements of the law as to due process must be followed for a proper hearing to be held.

\*　　\*　　\*　　\*　　\*　　\*

5. Reports of the State Welfare Department are not by themselves admissible in evidence at a juvenile court hearing, and any report based on hearsay evidence is generally inadmissible.

In another abuse and neglect case, *State ex rel. Lemaster v. Oakley,* 157 W.Va. 590, 595, 203 S.E.2d 140, 143 (1974), we disapproved of a juvenile court's reliance on reports from caseworkers whose testimony was not subjected to cross-examination.

In the context of a child custody dispute between parents, we stated in *Tucker v. Tucker,* 176 W.Va. 80, 83, 341 S.E.2d 700, 703 (1986) (*per curiam* ) that "... a court should never be satisfied in determining a matter of this kind except upon the production of the best evidence possible to be procured .... [which is] the testimony of witnesses in open court, tested by cross examination." 176 W.Va. at 83, 341 S.E.2d at 703, *quoting* from *Cornelison v. Cornelison,* 53 Idaho 266, 270, 23 P.2d 252, 253 (1933).

In Syllabus Point 3 of *In the Interest of Moss,* 170 W.Va. 543, 295 S.E.2d 33 (1982), a juvenile transfer-to-adult-criminal-jurisdiction case, we held that the probable cause determination in a transfer hearing may not be established entirely by hearsay evidence.[8]

8. In *In Re E.H.,* 166 W.Va. 615, 276 S.E.2d 557 (1981), another juvenile transfer hearing case, we held that the strict requirements of the *Rules of Evidence,* that are applicable to juvenile adjudicatory hearings, did not apply to a transfer hearing. However, we noted that our law [currently] *W.Va.Code,* 49–5–2(i) [2001] requires that in all proceedings under Chapter 49—which includes status offense proceedings under 49–5–11a [1998], "... a juvenile shall be afforded ... the opportunity to ... cross-examine witnesses." We stated in *In Re E.H.*:

As to those other hearings which are set out in *W.Va.Code,* 49–5–1 (1978), *et seq.,* and which are heard by the court or referee and do not involve the issue of culpability, the Legislature has provided a more general standard. This standard comports with the traditional rule that where matters are heard before a court without a jury, there is a broader latitude on evidentiary matters, since it is assumed that a judge can weed out the extraneous from the relevant and because of his legal training will

In the instant case, we have already ruled that—even accepting the minimal substantive evidence that was presented by means of the hearsay statements of the two witnesses who testified at the March 25, 2002 hearing—sufficient proof under the circumstances to remove the juvenile from his parent's custody and home was not adduced. We therefore need not specifically rule on the issue raised in the instant appeal, complaining of the entirely hearsay nature of the evidence against the juvenile at this hearing.

However, to clarify the law for future cases, and consistent with our hereinabove-discussed decisions in this area, we hold that ordinarily and in the absence of emergency circumstances a circuit court's decision under *W.Va.Code*, 49–5–11a(b)(2) [1998] to award custody of a juvenile status offender to the Department of Health and Human Resources and/or to place a juvenile status offender outside of their parents' home may not be based entirely upon hearsay evidence; and that the constitutional rights of due process, representation by counsel, notice, opportunity to be heard, and to present and cross-examine witnesses must be afforded to the juvenile and the affected parent in a proceeding brought pursuant to said statutory provision.

## IV.

### Conclusion

The circuit court's order transferring custody of the juvenile from his parent to the Department of Health and Human Resources

not be influenced by otherwise inadmissible evidence. [Citation omitted.]
166 W.Va. at 627, 276 S.E.2d at 565.
Additionally, Syllabus Point 3 of *State v. Gary F.*, 189 W.Va. 523, 432 S.E.2d 793 (1993) states:
A juvenile is denied his constitutional right to confront his accusers when a critical witness, who has not been demonstrated as unavailable pursuant to the rules of evidence, is permitted to testify by telephone during a transfer hearing.
In *State v. Stuckey*, 174 W.Va. 236, 324 S.E.2d 379 (1984) (*per curiam* ), another juvenile transfer case, we stated that hearsay testimony alone would ordinarily be insufficient to support a decision to transfer a youthful offender from the

and authorizing his placement out of his home is reversed.

Reversed.

Justice McGRAW dissents.

Anthony Center, citing with approval cases from many jurisdictions holding that hearsay alone cannot ordinarily support a probation revocation ruling. 174 W.Va. at 238, 324 S.E.2d at 381.
And in *State v. Evans*, 203 W.Va. 446, 448 n. 2, 508 S.E.2d 606, 608 n. 2 (1998), we stated that while the *West Virginia Rules of Evidence* do not apply at probation revocation hearings, this does not mean that there are no constitutional limitations on the evidence used at such hearings, such as the protection of the right of confrontation. *See also Southern v. Burgess*, 198 W.Va. 518, 482 S.E.2d 135 (1996) (*per curiam* ) (parole revocation upheld because decision was not based solely on hearsay evidence).